**Albert KAUFMANN, Plaintiff,**

v.

**Mary Wells LAWRENCE et al.,
Defendants.**

**No. 74 Civ. 5081.**

United States District Court,
S. D. New York.

Dec. 5, 1974.

Nemser & Nemser, by Stanley Nemser, Norman S. Nemser, Peter Wang, New York City, for plaintiff.

Hughes, Hubbard & Reed, by Robert J. Sisk, Orville H. Schell, Jr., Amalya L. Kearse, New York City, for defendants.

## OPINION

### ROBERT L. CARTER, District Judge.

#### I

This case involves a controversy as to the legal validity under federal securities laws of an exchange offer made by the defendant, Wells, Rich, Greene, Inc. (WRG) to holders of its common stock. Plaintiff, a holder of 100 shares, brings this action as a class action on behalf of himself and all other holders of WRG common stock, excluding such holders who are directors and officers and the members of their immediate family. Plaintiff is seeking to enjoin consummation of the exchange offer, to require withdrawal of the offer and a return of all shares of common stock tendered thereunder. Plaintiff invokes as the bases for his claims Sections 10 (b) and 14(e)(15 U.S.C. §§ 78j(b) and 78n(e)) of the Securities Exchange Act of 1934 and Rule 10b–5 (17 C.F.R. 240.-10b–5) of the Securities Exchange Commission and common law principles. Jurisdiction exists pursuant to Section 27 (15 U.S.C. § 78aa) of the Securities Exchange Act.

As is usual in matters of this kind, the action was brought at the eleventh hour, and pressure for hurried determination was heavy.

The complaint was filed on Tuesday, November 19, 1974. Plaintiff's motion for preliminary injunction was filed on Thursday, November 21, 1974, and an evidentiary hearing was held on the motion on Monday, November 25, 1974.

At the close of the evidentiary hearing, since the exchange offer was scheduled to expire at 5 p. m. on that day, at which time the disputed transaction was to have been fully consummated, an order was issued restraining the completion and conclusion of the matter pending determination of the pending motion for preliminary injunctive relief.

#### II

WRG, a full-service advertising agency, is a New York corporation with principal offices in New York City. It proposes advertising programs for its clients, writes and produces television and radio commercials, contracts for advertising terms and space, and arranges for distribution of advertising materials. The individual defendants are directors and officers of the company. Defendant Mary Wells Lawrence was the founder of the company and is its chief executive officer.

The company was organized in 1966. Between approximately April, 1966, and June, 1968, the officers and directors acquired 1,450,600 shares of common stock of the company at an aggregate cost to them of $548,600. Thereafter, in 1968, a public offering of WRG common stock was made for the first time, consisting of a total of 409,900 shares at $17.50 per share. Of these 409,900 shares offered, 359,900 shares belonged to officers and directors of the company. In 1968, through this offering, the public invested $7,173,250 in the company. The officers and directors netted some $5,-866,370 from this investment of funds from the public. Defendant Lawrence, who had bought founders' shares in 1966 for $30,100, realized some $1,266,575 as a result of this 1968 sale of stock to

the public.[1] As of August 31, 1974, the issuance of 5,000,000 shares of WRG common stock was authorized; 1,631,588 shares had been issued, of which 265,-052 shares were held by WRG officers, directors and employees.

WRG stock was listed and traded on the American Stock Exchange beginning in 1970, and in connection with the second public offering in 1971, the stock was transferred for listing and trading to the New York Stock Exchange. In 1971, some 333,739 shares, all owned by WRG directors, officers and employees, were sold to the public at $21.75 per share. The public invested some $7,258,823.25 in the company in the purchase of WRG shares in the 1971 offering. The aggregate net amount realized from this second public sale was $6,841,-649, of which defendant Lawrence received $2,272,425.

The corporation has prospered. Its gross billings grew from $77 million in the fiscal year ended October 31, 1969, to $115 million in fiscal year ended October 31, 1973. Earnings per share rose from $1.02 in fiscal 1969 to $2.04 in the fiscal year ended October 31, 1973. The company was described by plaintiff's expert at the November 25th hearing, as having developed a fine reputation, being noted for creativity in advertising, the possession of excellent business management and first-rate clients. Its common stock rose to a high of 27⅞ in 1972, but was selling at 5½ immediately prior to the exchange offer which is the subject of this controversy.

The idea of buying back the public stock was planted in the winter of 1973. Apparently what helped further the idea of removing the company from the public realm was an abortive attempt to buy out another company. These were sensitive negotiations, and we are advised that because the nature of the negotiations had to be fully disclosed to the SEC, they had to be terminated.

The decision to pursue going "private" further was made in August, 1974. Just prior to the September 4, 1974, WRG Board meeting, the advice of Paul Hallingby, Jr., President and chief Executive Officer of White, Weld & Co., Inc., was sought about the wisdom, fairness and advisability of the proposed exchange offer. White, Weld & Co., Inc. had acted as managing underwriter for the 1968 and 1971 public offerings, and since 1968 had been WRG's investment banking advisor and consultant. Hallingby in a letter dated September 4, 1974, advised Mrs. Lawrence that the exchange offer would be attractive and that the offering price of $3 in cash and $8 principal amount of 10% subordinated sinking fund debentures constituted fair value for the company's stock in the light of current market conditions. The transaction as finally approved by the Board at the September 4, 1974, meeting and offered to the public, was an offer to purchase from holders of its common stock, up to 1,405,008 shares of common stock, representing all of the issued outstanding shares except approximately 226,850 shares owned by members of the Board of Directors. The Board had agreed not to participate in this exchange offer. A holder would receive for each share tendered $3 in cash and $8 principal amount of a newly created 10% subordinated sinking fund debenture maturing on November 1, 1984, and bearing interest at 10% per annum. The debentures are unsecured obligations of the company limited to an aggregate principal amount of $11,240,064. Payment of the principal and interest is subordinated to all prior debt, and payment in any case is contingent upon the company being solvent and having a surplus at the time of payment. The debentures are redeemable at WRG's option. WRG is to pay into the sinking fund, on or before November 1, of each year from 1975 to 1983 in cash 10% of the aggregate principal amount of

---

1. This net figure is not all profit. It is the amount received by the individuals after deductions for commissions and other costs involved in the offering.

the originally outstanding debentures. WRG has the right to reduce its cash payments to the sinking fund by filing debentures with the Trustee which the company had acquired. The package is estimated to have a current value of $9 per share, but is actually selling at roughly a 30% discount. White, Weld & Co., Inc. has agreed to guarantee an over-the-counter market for any shares not tendered, and at the November 25th hearing, one of its officers, Brian Little, testified that a market could be made with as few as 50,000 shares.

The offer expired at 5 p. m. on November 25, and all tenders became irrevocable after November 12th. White, Weld & Co. is dealer-manager of the offer and Chase Manhattan Bank is the exchange agent. The Prospectus bears the statement, *"Participation in the Exchange Offer is completely voluntary and the Company makes no recommendations with respect thereto"* (italics in the original). The Prospectus further states that neither the company nor the Board is making any recommendation as to whether the offer should be accepted or rejected.

The offer was first announced on September 4, at the close of trading on the New York Stock Exchange. The announcement was in the form of a press release.

### III

This case involves what is apparently a growing trend in the business community—a public company going "private." Plaintiff alleges violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 in that the Prospectus setting forth the terms of the exchange offer contains false and misleading statements, misrepresentations and material omissions. It is further contended that the exchange offer is in fact a scheme and device to defraud. The §§ 10(b) and 14(e) violations alleged are the absence of any reference in the Prospectus to the White, Weld & Co. letter of September 4, 1974, advising WRG that the exchange offer

proposed was fair and attractive in business terms; the absence of any mention in the Prospectus that the 10% sinking fund debentures and purchase fund may be doubled in any year; the failure of the Prospectus to state that Lawrence and other directors and employees had bought WRG shares in 1974 prior to the exchange offer; and the failure to reveal the price at which defendant Lawrence and the other directors had bought WRG shares prior to the first public offering.

■ A misrepresentation or omission within the meaning of the federal securities laws invoked in this case is one that a reasonable man would consider important to his decision to tender or not tender his shares, see, List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968); Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362 (2d Cir. 1973); Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281 (2d Cir. 1974), or might have been considered important to that determination, see Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). For a thorough discussion of the two applicable standards, see this court's opinion (Cannella, J.) in Broder v. Dane et al., 384 F.Supp. 1312 (S.D.N.Y.), dated November 21, 1974.

■ In order for a party seeking a preliminary injunction to prevail, he must either show the likelihood of success on the merits and irreparable injury, or he must raise sufficiently serious questions going to the merits to make them a fair ground for litigation and establish that the balance of hardship tips decidedly in his direction. *See*, *e. g.*, Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687 (2d Cir. 1974).

■ Applying the first standard, the omissions and misrepresentations relied upon cannot be considered material under either the "would" or "might" standard.

The omission of the references to the White, Weld & Co. "go ahead" opinion letter of September 4, 1974, to the right to double the amount of the cash contribution to the sinking fund debenture in any one year and to the cost at which Mrs. Lawrence and the other directors originally purchased their shares are obviously makeweight arguments on the issue of §§ 10(b) and 14(e) materiality.

The failure of the Prospectus to specify the number of shares recently bought by Mrs. Lawrence and other directors and employees in 1974 prior to the exchange offer does not bring this case within the parameters of Broder v. Dane. There a large block of stock was bought by defendant Stern from members of the Dane family at premium prices, far in excess of the prevailing market price. Failure to disclose this fact was considered a material violation within the reach of Section 10(b). Here Mrs. Lawrence in percentage terms, bought a small number of shares, and the shares were purchased at prevailing market prices. Moreover, while the 1974 purchases were not specified, the aggregate total of shares held by the directors and officers as of September 1, 1974, is set out in the Prospectus.

On this record, without determining what proof may be presented at trial to bolster the case, plaintiff has clearly not established the likelihood of success at trial.

The "serious question" test, see Gulf & Western Industries, Inc., supra, however, is undoubtedly more appropriately applicable to this case. The issue raised is undeniably serious and troublesome. The public has invested some $14 million in the company. The decision to buy out the public during the current depressed market will enable the public shares to be repossessed at a fraction of the original cost to the public shareholders. Moreover, if the exchange offer is successful, i. e., if the number of shareholders is reduced to fewer than 300, the company will be able to operate as a private corporation free from public regulation and oversight.

A member of the Securities and Exchange Commission, A. A. Sommer, Jr., has manifested concern about the trend of public companies to go "private," and is quoted as suggesting that "under well established legal principles such conduct may also be unlawful." (Wall Street Journal, November 15, 1974). The statement places stress on the benefits to, and large profits realized by, insiders when a company goes "private" because the stock market's depressed state enables the shares, previously purchased at high prices, to be repurchased at bargain rates.

This is really the basic issue and principle which plaintiff seeks to litigate. Plaintiff stresses the small capital investment of the directors prior to the 1968 offering, and the subsequent huge gains realized in the sale of their stock to the public in 1968 and 1971. Plaintiff contends that the exchange offer is an attempt to squeeze out the public and the package does not give the public fair value. At the hearing, plaintiff's expert testified that the appropriate way to measure true value was by what he called "intrinsic value"; that figure is arrived at by looking at the history of the price-earnings ratios of a company. Using that formula, he placed the current value of WRG shares at a high of $22 and a low of $19—$20. Defendants are, of course, using current market value to measure the fairness of the exchange offer, and that certainly is regarded as a fair indication of value. See Application of Deutschmann, 281 App.Div. 14, 116 N.Y.S.2d 578 (1st Dept. 1952). Whether the offer is fair or unfair or a good or a bad transaction, however, does not raise a federal question. See Lewis v. Siegel, CCH Fed. Sec.L.Rep. ¶ 93, 992 (S.D.N.Y., May 18, 1973); Armour and Company v. General Host Corporation, 296 F.Supp. 470 (S.D.N.Y.1969).

Plaintiff alleges that the statement in the Prospectus to the effect that the shareholders' response to the exchange offer is voluntary is a misrepresentation. He contends that the pro-

posal is really intended as an immediate or ultimate squeeze-out of the public. He may well be right, but I do not think that helps his cause. Obviously, defendants are seeking to capitalize on the current economic downtrend and are offering their shareholders a package which is attractive only because of unfavorable economic conditions. In fact, the package is saleable only because of those conditions. The shareholder may tender his stock and sell the debentures at a discount in order to get out while he can. He may, however, gamble and refuse to tender, or tender and indicate his faith in WRG's future prosperity by holding the debentures until maturity. The Prospectus gives him all the relevant facts and he can act on the basis of full information.

This is not the case of any hidden or secret action by an outside group to take over control of the company. Nor does there appear to be any sizeable group of shareholders opposed to the exchange proposal. Indeed, if such opposition does exist, defendants' plans to go "private" will be frustrated by a sizeable number of shareholders refusing to tender their shares.

■■ While Sections 10(b) and 14(e) must be read flexibly, and not technically or restrictively, *see* Superintendent of Insurance of the State of New York v. Bankers Life and Casualty Company, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed. 2d 128 (1971); accord, Drachman v. Harvey, 453 F.2d 722, 737 (2d Cir. 1972), there is nothing invalid *per se* in a corporate effort to free itself from federal regulations, provided the means and the methods used to effectuate that objective are allowable under the law. Nor has the federal securities law placed profit-making or shrewd business tactics designed to benefit insiders, without more, beyond the pale. Those laws in respect of their design and interpretive reach, as I understand them, including the provisions relied on here, are satisfied if a full and fair disclosure is made, so that the decision of the holders of WRG stock to accept or refuse the exchange offer can be said to have been freely based upon adequate information. See Popkin v. Bishop, 464 F.2d 714, 721 (2d Cir. 1972).

■ A public company going "private" may indeed raise serious questions concerning protection of the public interest. There is, however, no foundation on the record before me from which the ramifications of that interest within the reach of the federal securities laws might conceivably be explored. Thus plaintiff has failed to meet the alternative test pursuant to which a preliminary injunction might appropriately be granted.

■ Finally, it should be added that even if I am in error as to the reach of the federal securities laws, the plaintiff and the class he represents have an adequate remedy at law. Monetary damages will suffice to make them whole. *See* Tanzer Economic Associates v. Haynie, 388 F.Supp. 365 (S.D.N.Y.1974) (Frankel, J.).

·For these reasons, the motion for preliminary injunction is denied, and the restraining order heretofore entered is vacated. It is so ordered.