**ALABAMA FARM BUREAU MUTUAL CASUALTY COMPANY, INC., etc.,**
Plaintiff-Appellant,

v.

**AMERICAN FIDELITY LIFE INSURANCE COMPANY, etc., et al.,**
Defendants-Appellees.

No. 77–1661.

United States Court of Appeals,
Fifth Circuit.

Nov. 15, 1979.

Rehearing and Rehearing En Banc
Denied Jan. 15, 1980.

Christine Reiger Milton, John H. Wilbur, Dudley Allen, Jacksonville, Fla., for plaintiff-appellant.

D. L. Middlebrooks, Pensacola, Fla., Charles N. Brower, Donald T. McNaughton, Alan L. Morrison, Washington, D. C., for Woodbury, Marques, Mauch, Richardson & Mertins.

Bert H. Lane, William H. Clark, Pensacola, Fla., for Hulse, Sikes, Smith & Riera.

Before SKELTON *, Senior Judge, HILL and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

■ The plaintiffs in this stockholders' derivative action seek to recover for alleged violations of Rules 10b–5, 17 C.F.R. § 240.-10b–5 (1976), and 14a–9, 17 C.F.R. § 240.-14a–9 (1976) of the Securities and Exchange Commission, and corresponding provisions of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a), in the course of a stock repurchase program instituted by the defendants in 1974 and 1975. Finding certain facts to be undisputed, the district court granted summary judgment for the defendants on the basis that: (1) Rule 10b–5 was not violated because there was no "deception" of or "injury" to the plaintiffs in connection with the repurchase program; and (2) Rule 14a–9 was not violated because there were no significant misstatements or omissions in the proxy materials. The plaintiffs, who were never allowed to complete discovery in this matter, contest the court's conclusions and also assert that there was a genuine issue of material fact concerning whether the repurchase program was a "manipulative device" to boost the price of the corporation's stock and thereby protect management's control of the corporation. This is an issue that was raised in Alabama Farm's amended complaint but not directly considered by the district court. Despite the lengthy and able consideration of the issues by the trial judge on the motion for summary judgment, we find that there are genuine issues

---

* Senior Judge Byron G. Skelton of the United States Court of Claims, sitting by designation.

of material fact as to whether the stock repurchase program, as intended and carried out, was a manipulative device that injured the corporation by artificially boosting the price of the shares purchased by the corporation, and regarding whether the shareholders were "deceived" by the nondisclosure of this alleged scheme. It was, therefore, inappropriate, at least at the stage reached in the proceedings, to dispose of these portions of the case by summary judgment. With respect to the other charges, however, summary judgment was proper.

## I. *Background*

American Fidelity [AMFI], a Florida life insurance company, issued stock to the public in the early 1960's at an average price of $25 per share. The stock, which is traded over the counter, reached a high of $45 per share on January 2, 1973; thereafter, during a general market decline the price fell until it was below $10 per share.

In September, 1973, a committee of AMFI's Board of Directors discussed repurchasing some of the company's stock. In October the committee voted to seek permission from the State of Florida and the SEC to repurchase up to $2,000,000 of its own stock on the open market.[1]

Then, beginning in October, 1973, Alabama Farm began to buy AMFI stock. By November, 1974, it had spent $2,530,000, and had acquired over 300,000 shares, approximately 20 percent of the then outstanding stock.

Shortly after Alabama Farm commenced its purchases of AMFI stock, the AMFI Board unanimously approved its committee's decision to seek authorization for a repurchase program. The program was launched with a press release on January 2, 1974, which also stated the Board's intention to carry out the purchases in a manner that would not unduly affect the market for the stock. The repurchase program was also described in AMFI's 1973 annual report, its 1974 mid-year report, and in addi-

tional press releases issued during the course of the program. In September, 1974, AMFI issued a press release announcing that, although the company had not completed the initial $2,000,000 stock repurchase program, it had increased the amount authorized for the program to $3,000,000. By February, 1975, AMFI had acquired a total of 314,535 shares at an average price of $8.41 per share.

In December, 1974, Alabama Farm filed this action in United States District Court for the Middle District of Florida charging AMFI and five of its directors with various violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*

On March 24, 1975, the directors of AMFI mailed proxy materials to the company's stockholders in anticipation of the annual meeting to be held on April 22, 1975, at which the shareholders were to vote on resolutions to approve the past stock repurchases and an amendment to AMFI's certificate of incorporation reducing the number of directors from twelve to nine. In addition, the proxy materials sought votes on resolutions to approve amendments to AMFI's by-laws raising to three-quarters of the outstanding common stock the percentage of common stock necessary to remove a director without cause or to constitute a quorum for any meeting at which election or removal of directors was considered. The proxy materials consisted of a notice of the annual meeting, a proxy statement, and AMFI's 1974 Annual Report, and they disclosed the existence and nature of plaintiff's present suit.

Alabama Farm responded by filing a second lawsuit in the United States District Court for the Middle District of Alabama seeking to enjoin the annual meeting on the grounds that the proxy materials contained misstatements and omissions in violation of Rule 14a–9 of the SEC. Thereafter, AMFI mailed to its stockholders a supplemental proxy statement informing them of the allegations contained in the recently filed lawsuit.

---

1. AMFI then had outstanding 1,812,735 shares of capital stock.

Alabama Farm then filed another action, this time in the Circuit Court for Escambia County in Pensacola, Florida. This action charged violations of Florida law governing the right of stockholders to inspect corporate records. After a hearing in April, 1975, the Florida district court denied the plaintiff's request for preliminary relief and entered an order enjoining further prosecution of the other suits and requiring Alabama Farm to file an amended complaint presenting all related claims.

In May, 1975, Alabama Farm filed the amended complaint now before this court. This pleading combined the charges made in all of the previously filed actions and added one additional state law claim. Count I charged that the individual defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and rule 10b–5 of the SEC, 17 C.F.R. § 240.-10b–5 (1976), by causing AMFI to launch a stock repurchase program resulting in the acquisition of over 300,000 shares of AMFI common stock during 1974. The individual defendants were alleged to have entered into a plan "to perpetuate and maintain their control of American Fidelity by manipulating the market in the Shares and artificially inflating the market price of the Shares by causing American Fidelity to repurchase Shares in order to discourage other shareholders or nonshareholders from purchasing Shares or attempting to gain control of American Fidelity through the purchase of Shares." The complaint also alleged that these defendants deceived the shareholders in numerous ways in executing this scheme, and sought $3,423,078 in damages.

Count II charged that the individual defendants violated § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1970), and Rule 14a–9 of the SEC, 17 C.F.R. § 240.14a–9 (1976), by mailing proxy and supplemental proxy statements containing material misstatements and omissions. The plaintiff sought a declaratory judgment declaring all proxies obtained by use of the disputed proxy statements null and void and declaring the stockholders meeting of April 22, 1975, at which these proxies were voted, unlawful and all acts and resolutions of that meeting null and void; plaintiff also requested an order directing that a new stockholders' meeting be held and providing for the solicitation of new proxies. Counts III and IV asserted pendent state claims.

Alabama Farm made a number of attempts to exercise its discovery rights, but they were largely resisted by the defendants, and the district court did not order full discovery. For example, the defendants were served with interrogatories in January, 1975, but only one interrogatory was answered, and that was only after the district court had ordered a response.

In January, 1975, Alabama Farm also sought the production of minute books of AMFI's Executive Committee, Finance Committee and Board of Directors. These books were never produced, even though Alabama Farm offered to examine them at any location specified by the defendants so as not to disrupt AMFI's operations. The district court never heard or ruled on two motions Alabama Farm filed seeking to compel production of these records.

Alabama Farm fared little better with its attempts to obtain depositions. Of thirty-eight depositions scheduled by it, only fifteen were actually taken, with five of those restricted to a motion to transfer. The defendants filed fourteen motions for protective orders with respect to scheduled depositions. Alabama Farm found it necessary to file fifteen motions to compel answers to questions that witnesses refused to answer. The district court never heard or ruled on any of these motions.

On December 22, 1975, the district court held a hearing on the defendants' motion to dismiss, or in the alternative for summary judgment, and on the plaintiff's motion for partial summary judgment on one of the state law claims. A request for a stay of discovery was included in the motion for summary judgment, and was granted on February 13, 1976, by a different judge than the one who heard that motion. Because the judge who was considering the

summary judgment motion had indicated that a ruling would shortly be issued, the second judge ordered Alabama Farm to stay discovery until ten days after the ruling on the defendants' motion to dismiss or for summary judgment. In fact, though, the ruling on the summary judgment motion was not released until a year later; on February 11, 1977, the court granted summary judgment for the defendants on Counts 1 and 2 and dismissed the state law claims without prejudice. In the interim, Alabama Farm was unsuccessful in its attempts to have the stay dissolved.[2]

## II. The Alleged Violations of § 10(b) and Rule 10b–5

■ Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), makes unlawful the use of "any manipulative or deceptive device or contrivance" in contravention of SEC rules. Rule 10b–5, promulgated by the SEC under § 10(b), prohibits, in addition to nondisclosure and misrepresentation, any "artifice to defraud"

or any act "which operates or would operate as a fraud or deceit." A cause of action lies under Rule 10b–5 "only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Santa Fe Industries, Inc. v. Green,* 1977, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480, 492. A breach of fiduciary duty by majority stockholders or corporate officers without any manipulation, deception, misrepresentation or nondisclosure violates neither the statute nor Rule 10b–5; such a violation is actionable solely under state law. *Id.*

■ In this action Alabama Farm alleged that the individual defendants' conduct was fraudulent because they did not disclose to the Board or the shareholders either their real motive for adopting the repurchase program, which was allegedly to retain their position of control over AMFI,[3] or the effect of the program on the company's statutory capital and surplus,[4] which under

---

2. We recognize that these matters arose at times when the district court was heavily burdened with demanding criminal trials and with the exigencies of the Speedy Trial Act; that the district had an inadequate number of judges to meet the demands of its trial calendar; and that the judge who had initially handled the case and later heard the motion for summary judgment had, in the meanwhile, been appointed to this court, and was, therefore, by that time attempting to carry an almost superhuman double load. Our observations in the opinion are, therefore, in no way critical of the intensive efforts that were obviously made by the trial judge to consider fully the issues in this complex case while under multiple pressures.

3. In a related allegation, Alabama Farm asserted that the defendants failed to disclose their possible "conflict of interest." The conflict of interest that allegedly should have been disclosed by them was their interest in maintaining control of the corporation.

Corporate directors and officers of a corporation are under a duty to disclose their interests in other parties that engage in transactions with the corporation. The existence of such interests in a party to a securities transaction with the corporation is "material" information to the corporation's shareholders or directors; thus, the failure to disclose such information is "deceptive" within the meaning of Rule 10b–5. *See Kidwell v. Meikle,* 9 Cir. 1979, 597 F.2d 1273, 1293; *Swanson v. American Consumer*

*Indus., Inc.,* 7 Cir. 1969, 415 F.2d 1326, 1330. *Cf. TSC Indus., Inc. v. Northway, Inc.,* 1976, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (§ 14(a) and Rule 14a–9 violation).

In this case, however, it is not alleged that the directors had a conflicting interest in another party to a corporate transaction. It is also not alleged that the ownership interests of the directors of AMFI were not disclosed; they were, of course, public information. Thus, any conflict of interest was readily apparent, *see Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 2 Cir. 1975, 524 F.2d 275, 282, or a matter of "characterization" of the purpose and effect of the transaction rather than of "fact." *See Goldberg v. Meridor,* 2 Cir. 1977, 567 F.2d 209, 218, n.8, *cert. denied,* 1978, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771.

4. Florida statutes specify those assets that the Florida Department of Insurance will consider in determining an insurer's financial status; these assets are called "admitted assets." Under this "statutory accounting," treasury stock (previously, issued stock owned by the corporation that issued it) is a "non-admitted asset", an asset that is not counted in determining the insurer's financial status. Fla.Stat. § 625–031(3). Thus, if an insurer purchases its own stock, or any other non-admitted asset with cash (an "admitted asset"), its statutory capital or surplus is reduced because an asset carried on its statutory accounting balance sheet is replaced by an asset that cannot be carried on this balance sheet.

Florida law could adversely affect its ability to write new insurance.[5] The district court found that the undisputed facts showed that the company had adequately disclosed the existence, size and effect of the program, and it held that Rule 10b–5 does not require corporate directors and officers to disclose their subjective motivation in adopting a stock repurchase program.

■■ The burden is on the party seeking summary judgment to show that there is no genuine issue of material fact. The "party opposing the motion is to be given the benefit of all reasonable doubt in determining whether a genuine factual issue exists." *Kellerman v. Askew,* 5 Cir. 1976, 541 F.2d 1089, 1092. In considering a summary judgment motion, the inferences most favorable to the party opposing the motion will be drawn. *Boazman v. Economics Lab., Inc.,* 5 Cir. 1976, 537 F.2d 210, 214. Such inferences may create disputes regarding basic facts or regarding facts to be inferred from such facts.

■ "In applying the basic principles the factor of access to proof must, however, be seriously considered in ruling on a defendant's motion for summary judgment, particularly in [a stockholder's derivative action] where plaintiff's proof must come mainly from sources largely within the control of the defendants and from the mouths of the alleged wrongdoers." 6 *Moore's Federal Practice* ¶ 56.17[60] at 56–1065 (1976 ed.) (footnotes omitted). Summary judgment should not, therefore, ordinarily be granted before discovery has been completed. *Goldberg v. Meridor,* 2 Cir. 1977, 567 F.2d 209, 213, *cert. denied,* 1978, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771. *See also Schoenbaum v. Firstbrook,* 2 Cir. en banc 1968, 405 F.2d 215, 218 *cert. denied sub nom. Manley v. Schoenbaum,* 1969, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219. " 'Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment, as are those in which the issues turn on the credibility of the affiants.' " *Slavin v. Curry,* 5 Cir. 1978, 574 F.2d 1256, 1267, quoting *Conrad v. Delta Air Lines, Inc.,* 7 Cir. 1974, 494 F.2d 914, 918.

■ Summary judgment may be improper, even though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts. *Winter v. Highlands,* 5 Cir. 1978, 569 F.2d 297, 299. " '[T]he choice between permissible inferences is for the trier of facts.' " *Nunez v. Superior Oil Co.,* 5 Cir. 1978, 572 F.2d 1119, 1124, quoting, *Walker v. U.S. Gypsum Co.,* 5 Cir. 1959, 270 F.2d 857, 862, *cert. denied,* 1960, 363 U.S. 805, 80 S.Ct. 1240, 4 L.Ed.2d 1148. Where a jury is called for, the litigants are entitled to have the jury choose between conflicting inferences from basic facts. *Nunez, supra,* 572 F.2d at 1124. However, where the judge is the trier of fact, as was the case here, he may be in a position to draw inferences

5. Florida law mandates that insurers maintain at least a specified minimum statutory capital and surplus. Fla.Stat. § 624.409. Should an insurer's statutory capital and surplus fall below these minimum amounts, the Department of Insurance can declare the insurer insolvent and place it in receivership. Fla.Stat. § 631.-051. Problems may also arise even before this minimum level is reached.

If statutory capital and surplus is depleted to the point that the corporation is in danger of falling below the minimum levels established by statute, then the company will be rendered more vulnerable to investment losses. For example, under statutory accounting all the costs of writing a new policy must be accounted for in the year incurred, rather than amortized over the life of the policy. If an insurer has an unprofitable year, these expenses will deplete statutory capital and surplus, and if the insurer's statutory capital is already at a low level, it may have to limit its writing of new insurance. Moreover, investment losses are charged directly to statutory capital and surplus; if substantial, they may force an insurer that has only the minimum level of capital and surplus to seek reinsurance of all or a substantial portion of one of its lines of insurance. This is disadvantageous to the insurer because its profits must be reduced to allow profit to the reinsurer, it must pay the reinsurer to administer the business, and it will incur additional administrative costs in reporting to the reinsurer.

without resort to the expense of trial, unless there is an issue of witness credibility. *See id.* at 1124–25.

Applying these criteria, we find that the defendants did succeed in establishing the absence of any genuine issue of material fact related to the allegations we have just discussed. Although the plaintiff did not have an opportunity to complete discovery, some facts were so well established that it is not conceivable that they would ever be disputed, and no contention is made that countervailing evidence might be adduced regarding these points if further depositions or document examination were permitted. Thus, the fact that press releases were issued and their contents; the identity and contents of proxy statements; and certain other evidentiary facts established by documents are, indeed, undisputed. Considering this uncontroverted evidence, the district court correctly concluded that the plaintiff's allegations were either not sufficient to establish the requisite element of deception, even if proved, or were conclusively refuted.

■ Alabama Farm's thesis that the failure of a controlling stockholder or corporate official to disclose his motives in entering a transaction constitutes the "deception" requisite for a 10b–5 violation is not supported by the cases cited to us, e. g. *SEC v. Blatt,* 5 Cir. 1978, 583 F.2d 1325; *Goldberg, supra; Schoenbaum v. Firstbrook, supra; Subin v. Goldsmith,* 2 Cir. 1955, 224 F.2d 753, *cert. denied,* 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779; and *Fogelson v. American Woolen Co.,* 2 Cir. 1948, 170 F.2d 660. Nor has our own research disclosed any such circuit decisions. However, there is authority to the contrary. *Golub v. PPD Corp.,* 8 Cir. 1978, 576 F.2d 759, 765; *Joyce v. Joyce Beverages, Inc.,* 2 Cir. 1978, 571 F.2d 703, *cert. denied,* 1978, 437 U.S. 905, 98 S.Ct. 3092, 57 L.Ed.2d 1135. *See also O'Neill v. Maytag,* 2 Cir. 1964, 339 F.2d 764, 767; *see generally,* A. Fleischer, *Federal Corporation Law: An Assessment,* 78 Harv.L.Rev. 1146, 1166 (1965). *But see* A. Jacobs, 5A Securities Law Series, The Impact of Rule 10b–5, § 121.01 at 5–87 (1977). We believe that the position taken

by these courts is sound. Section 10(b) and Rule 10b–5 were promulgated to prevent fraudulent practices in securities trading and trading on inside information. *See, e. g., Santa Fe Industries, supra.* They were not intended to require, under normal circumstances, the disclosure of an individual's motives or subjective beliefs, or his deductions reached from publicly available information.

In *Goldberg, supra,* cited by the appellants, numerous material facts, including the effect of an exchange of assets for shares on the operating position of one of the corporate parties, were misrepresented. The defendants did not simply fail to disclose the purpose of the transaction; they falsely stated that the party whose shares were issued for an inadequate consideration was to become the principal operating corporate subsidiary in the resulting multi-corporate structure, when in actuality the transaction would seal its doom. Thus, the requisite "deception" was found on the basis of more than mere nondisclosure of the motive for the transaction. In addition, the court noted that it did "not mean to suggest that § 10(b) or Rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives." 567 F.2d at 218 n.8.

Of the other cases cited by the appellants, both *Subin, supra,* and *Fogelson, supra,* were diversity cases that involved alleged abuse of discretion by directors amounting to corporate waste. The motives of the directors in approving certain transactions were relevant to whether the directors had exercised "honest business judgment." Neither § 10(b) nor Rule 10b–5 was involved, and the cases clearly did not hold that directors must disclose their motives for approving corporate undertakings involving transactions in securities. In *Schoenbaum, supra,* and *Blatt, supra,* the issue was whether certain securities were purchased on the basis of undisclosed inside information concerning the value of the stock purchased. Neither case was concerned with the question of whether the defendants should have disclosed their "mo-

tive" in entering into the transaction. Although in *Schoenbaum* the court noted that "motive" may be important in many stockholders' derivative actions, it did not hold that disclosure of "motive," apart from material "facts", is required in securities transactions.

When the nature and scope of a transaction are clear, it is not necessary for the corporate instigators to characterize the various effects of the transaction as favorable or unfavorable or to evaluate its overall effect; such characterization is a matter of judgment, not fact. *See Golub v. PPD, supra.* However, it is necessary for the impact of a transaction to be described factually to the extent that such information would be significant to a reasonable, disinterested director, *Goldberg, supra,* at 219, or shareholder, *Kidwell v. Meikle,* 9 Cir. 1979, 597 F.2d 1273, 1293 n.10; *Joyce, supra,* 571 F.2d at 706–07 & n.6. *See Wright v. Heizer Corp.,* 7 Cir. 1977, 560 F.2d 236, 247, *cert. denied,* 1978, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (if shareholder approval not required, disclosure to board of directors sufficient if majority is disinterested; otherwise, disclosure to shareholders is required). *Cf. TSC Industries, Inc. v. Northway, Inc.,* 1976, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (materiality standard for action arising under § 14(a) and Rule 14a–9).

In this case, as the district court found, the size and scope of the stock repurchase plan were adequately disclosed.[6] The initial press release also pointed out that one effect of the program would be to decrease the firm's "capital" and "surplus". It was unnecessary for AMFI to outline any or all of the possible dangers that could be posed by a decease in statutory capital and surplus; the disclosure that they would be decreased was adequate.

In addition to the allegations discussed above, however, Alabama Farm alleged

that the repurchase plan was a part of a "plan or scheme to perpetuate and maintain . . . control of American Fidelity by manipulating the market in [AMFI's] Shares and artificially inflating the market price of the Shares . . . in order to discourage other shareholders or nonshareholders from purchasing Shares or attempting to gain control of" AMFI. This plan was alleged to have damaged AMFI "for the sole personal benefit" of the defendants. Alabama Farm also asserted that, in connection with this scheme, the defendants omitted to disclose the inflationary effect AMFI's repurchases would have on the market price of its outstanding shares. In granting summary judgment the district court discussed neither this alleged manipulative device nor the significance of the alleged omission.

Of course, any person having rudimentary knowledge of securities trading would realize that a course of purchasing stock would tend either to increase the price of the stock or to avert a decline in price that might otherwise occur. The allegation would not, therefore, even state a claim for which relief might be granted if it contended only that the defendants failed to reveal the obvious or the well-known. However, read as a whole, the complaint, as quoted above, asserts a scheme artificially to manipulate the market and artificially (that is, beyond the operation of normal market factors) to inflate prices.

The defendants contend that the manipulation alleged is not within the scope of Rule 10b–5, because it is not the traditional type of manipulation at which Rule 10b–5 was directed. In addition, they assert that, for this type of manipulative scheme to fall within the prohibition of Rule 10b–5, nondisclosure is essential, and they argue that the undisputed facts show that there was adequate disclosure. Furthermore, they contend that the injury, if any, was to those

---

**6.** The defendants presented evidence of a number of disclosures made by AMFI, including press releases issued on January 2, 1974, February 28, 1974, April 24, 1974, and September 24, 1974, and statements in AMFI's 1973 annu-al report and in a mid-year report mailed to stockholders on August 1, 1974. Alabama Farm has never disputed the contents of these disclosures, or the fact that they were made.

who found it more difficult to purchase shares, not to the corporation, which purchased shares at what they claim to have been their fair market value, and that Alabama Farm, as a derivative plaintiff,[7] had no standing to assert injury to persons other than the corporation. These contentions are not enough to shore up the summary disposition of Alabama Farm's claims.

As the defendants note, the Supreme Court has cautioned that " '[m]anipulation' is 'virtually a term of art when used in connection with securities markets.' " *Santa Fe Industries, supra,* 430 U.S. at 476, 97 S.Ct. at 1302, 51 L.Ed.2d at 493, quoting *Ernst & Ernst v. Hochfelder,* 1976, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668, 680. "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by *artificially* affecting market activity." (Emphasis supplied.) *Santa Fe Industries, supra,* 430 U.S. at 476, 97 S.Ct.

at 1302, 51 L.Ed.2d at 493–494. "Manipulation" has referred, in general, to devices used to induce investment in a company's stock, not to devices implemented to discourage such investment.

 Conduct designed to deter investment is within the scope of Rule 10b–5 when it acts as a deceit or works as a fraud on a corporation or those who have invested in its stock. *Cf.* A. Jacobs, 5A Securities Law Series: The Impact of Rule 10b–5 § 139.05[a] and [f] at 6–30, 6–37—6–39 (1977). Such conduct falls within the scope of the literal language of § 10(b) and Rule 10b–5 and is consistent with the congressional intent to proscribe intentional or willful conduct designed to deceive or defraud investors. As the Supreme Court has noted, § 10(b) is "described rightly as a 'catch-all' clause to enable the Commission 'to deal with new manipulative [or cunning] devices.' "[8] *Ernst & Ernst, supra,* 425 U.S.

---

7. Without discussion of the kind of class or the kind of class action involved, and without notice to the class, the district court certified the case as a class action in the following terms:

1. This action is properly maintainable as a class action. The questions of law or fact common to the members of the class predominate over questions affecting only individual members; in fact, the record does not suggest the existence of substantial questions affecting only individual members. The plaintiff is fully able to represent the class and to maintain this litigation. Furthermore, the maintenance of this action will render unnecessary, if not preclude, a multiplicity of suits by members of the class in other forums on claims arising out of the facts underlying the plaintiff's allegations in this case.

By the nature of the action this could be no more than the certification of a class of stockholders to whose ultimate benefit the derivative action might in part inure. The certification could not embrace the sellers of stock, and AMFI and American Fidelity were the only buyers. The district judge's comments during the hearing on the question of class certification are consistent with our conclusion that the class referred to in his order was a class of shareholders:

THE COURT: And I think I'll go ahead and find an appropriate class, but I think the notice to the class is something that the transferee judge ought to make.

MR. WILBUR: But you are maintaining a finding for the class?

THE COURT: You are in here representing an insurance company. You are fully liable to represent all the stockholders. Do you have any objection to the plaintiffs' insurance company as a proper representative of the class of stockholders?

\* \* \* \* \* \*

THE COURT: Well, I know that, but I think—they are entitled to a clear declaration of a class. I think—

MR. BROWER: I think there will be no problem about prompt and expeditious procedures in this case. That goes into the class action as well, Your Honor.

THE COURT: But you do not dispute the ability of the plaintiffs' insurance company to finance this lawsuit?

MR. BROWER: If it's a question—

THE COURT: And to represent the stockholders per se?

MR. BROWER: If it is a question of finance, I do not dispute the question of finance.

THE COURT: Or to represent the stockholders?

MR. BROWER: There have been other reasons why they are not the proper representatives of the stockholders of this company.

THE COURT: Well, that is something you will have to bring up later.

8. The Senate indicated in its report that § 10(b) was directed "at those manipulative and deceptive practices which have been demonstrated to fulfill no useful function." S.Rep.No.792, 73d Cong., 2d Sess., 6 (1934). A corporation's pur-

at 203, 96 S.Ct. at 1385, 47 L.Ed.2d at 682, quoting Hearings on H.R.7852 and H.R.8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 115 (1934) (remarks of Thomas G. Corcoran, a spokesman for the drafters of the provision that was to become § 10(b)). *See* A. Jacobs, 5A Securities Law Series: The Impact of Rule 10b–5 § 138.01 at 6–2—6–3. In addition, because this is "remedial" legislation, *SEC v. Capital Gains Research Bureau,* 1963, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237, 248, it must be construed " 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' " *Affiliated Ute Citizens v. United States,* 1972, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741, 760, quoting *SEC v. Capital Gains Research Bureau, supra,* 375 U.S. at 186, 84 S.Ct. at 280, 11 L.Ed.2d at 243. *See also A. T. Brod & Co. v. Perlow,* 2 Cir. 1967, 375 F.2d 393, 396.

Even if this alleged scheme was not a "manipulative" device within the meaning of Rule 10b–5, Alabama Farm adequately alleged "deception" in the defendants' failure to disclose that the repurchase plan was to be carried out in a manner that would artificially inflate the price of AMFI's stock in order to benefit the defendants personally and in their misrepresentation in the initial press release that the purchases would be carried out in a manner that would not unduly affect the market. The fact that, if this manipulative scheme was intended, some or all of the directors were aware of it, does not negate the element of· deception.[9] The requisite "deception" is provided if the disinterested directors or shareholders are misled, because they are fairly viewed as standing in the place of the corporate entity under these circumstances. *See, e. g., Kidwell, supra,* 597 F.2d at 1293; *Goldberg, supra,* 567 F.2d at 215–19; *Wright v. Heizer Corp., supra,* 560 F.2d at 247, 249; *Shell v. Hensley,* 5 Cir. 1970, 430

F.2d 819, 827; *Rekant v. Desser,* 5 Cir. 1970, 425 F.2d 872, 879–82; *Pappas v. Moss,* 3 Cir. 1968, 393 F.2d 865, 869; *see generally,* Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green,* 91 Harv.L.Rev. 1874, 1875, 1881–84 (1978); 1 A. Bromberg, *Securities Law: Fraud* § 4.7(542) to (544) (1977).

In *Santa Fe Industries, supra,* minority shareholders were "frozen out" of a corporate subsidiary in which they owned shares through a procedure under Delaware corporation law known as the "short-form" merger. This device allows a parent company that owns 90 percent or more of its subsidiary's shares to force the minority to sell their shares. The only remedy available to the minority shareholders if they consider the price offered inadequate is to seek appraisal of the shares in a state court. The minority shareholders brought a 10b–5 action alleging that the majority had breached their fiduciary duty to the minority under state law. In light of the language of the statute, the fact that Congress has left the regulation of shareholder-management relations largely to the states, and the problems posed by overlapping and possibly inconsistent federal and state laws in this area, the Court held that there is no implied cause of action under § 10(b) or Rule 10b–5 for a breach of state law fiduciary duty absent "deception" or "manipulation." 430 U.S. at 477–80, 97 S.Ct. at 1303–04, 51 L.Ed.2d at 494–496.

Applying this test, it noted that although the minority shareholders alleged that the majority stockholder's failure to give advance notice of the merger was a material nondisclosure, if such disclosure had been given, the minority would still have been able to seek relief only through appraisal in the state courts. Therefore, it concluded that this was not a material nondisclosure within the meaning of § 10(b) or Rule 10b–

---

chase of its shares at artificially inflated prices would not appear to serve a useful purpose.

**9.** A few courts initially suggested that the knowledge of officers and directors would be attributed to the corporation, thereby negating the element of deception. *See generally* A.

Bromberg, 1 Securities Law—Fraud: SEC Rule 10b–5 § 4.7(542) (1977) (hereinafter cited as *Bromberg* ) and cases cited therein. This "strict view" has generally been abandoned. *See Bromberg,* § 4.7(542) at 84.55.

5. Because no deception of manipulation was shown, the Court held that the suit failed.

*Santa Fe Industries* leaves open the question whether, in addition to showing that he could have brought a suit in the state court, a shareholder must show that he would have prevailed in the state court action. *See generally* Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green*, 91 Harv. L.Rev. 1874, 1893–98. The Ninth Circuit has held that he must prove both, *Kidwell, supra*, 597 F.2d at 1294, and the Seventh Circuit appears to have taken a similar approach. *Wright v. Heizer Corp., supra*, 560 F.2d at 250–51. However, in *Goldberg, supra*, the Second Circuit refused to dismiss a claim where a state suit would have been possible, even though there was no allegation that the shareholders would have succeeded. The court did not inquire further into the shareholder's likelihood of success in such a state action.

 We hold that all that is required to establish 10b–5 liability is a showing that state law remedies were available and that the facts shown make out a prima facie case for relief; it is not necessary to go further and prove that the state action would have been successful. On the one hand, to require merely the establishment of a theoretical legal claim under state law would be to predicate relief on a hypothetical basis. On the other, to require proof of victory would be in effect to exact the equivalent of a trial of the state claim. The rule that appears to us to be both desirable and practicable steers between Scylla and Charybdis: the plaintiff must show that there is at least a reasonable basis for state relief, but need not prove that the state suit would in fact have been successful.

 We turn then to Florida law to apply this standard. Florida law does not provide a state appraisal remedy for shareholders dissenting from their corporation's repurchase of its shares,[10] nor does it restrict relief for misconduct in connection with such repurchases to that remedy, unlike the Delaware provisions that governed the merger in *Santa Fe Industries, supra*. Under Florida law, the shareholders or directors could have sought injunctive relief to block the stock-purchase plan if they had been aware of this scheme.[11] Thus, there would have been a reasonable basis to seek relief in state court.

A reasonably prudent stockholder or disinterested director, in making an intelligent decision whether to take steps to stop the repurchase program, would certainly have considered it significant whether management had embarked on a program of maintaining control at the cost of inflating stock prices. Such a tactic might temporarily run up stock prices, but in the long run it might also lead to a complete corporate disaster either in terms of management ability or financial weakness. The alleged omission or misrepresentation, therefore, involved material information, *see Santa Fe Industries, supra*, 430 U.S. at 474 n.14, 97 S.Ct. at

**10.** Florida law provides an appraisal remedy for shareholders who dissent from a corporate merger, 18 West's F.S.A. § 607.247 (1977), but there is no such provision applicable to those who dissent from a repurchase of shares.

**11.** Under Florida law, directors are quasi-fiduciaries, and are liable to the corporation or the shareholders for breaches of their trust. *E. g., Orlando Orange Groves Co. v. Hale*, 1933, 107 Fla. 304, 144 So. 674, 677; *B. & J. Holding Corp. v. Weiss*, Fla.App.1977, 353 So.2d 141, 143. " 'Equity will protect a minority shareholder against conduct of the directors which is in breach of the trust confided in them and injurious to the stockholders . . .' " *Orlando Orange Groves, supra*, 144 So. at 677. The Florida courts may enjoin a director from

engaging in acts that are unfair to minority shareholders. *See id.* (temporary injunction against misuse of corporate assets); *Ridgeland Development Co. v. Bundy*, 1933, 108 Fla. 246, 146 So. 379 (suit to enjoin directors from cancelling their obligations to pay stock subscriptions and from disposing of corporate assets held sufficient against motion to dismiss); *Belcher v. Schilling*, Fla.App.1975, 309 So.2d 32 (shareholder derivative action seeking temporary and permanent injunctive relief and mandamus to invalidate proxies directors allegedly obtained from other shareholders by knowingly misleading them held sufficient to state cause of action). *See also Jacobs v. Adams*, 5 Cir. 1979, 601 F.2d 176.

1301, 51 L.Ed.2d at 492; *Kidwell, supra,* 597 F.2d at 1239 & n.10; *Goldberg, supra,* 567 F.2d at 219: *cf. TSC Industries, supra,* 426 U.S. at 449, 96 S.Ct. at 2133, 48 L.Ed.2d at 766 (materiality standard in action involving § 14(a) and Rule 14a–9), and *Santa Fe Industries* is distinguishable because in this case there was not full disclosure, manipulation and deception were adequately alleged, and the shareholders might have been able to obtain equitable relief blocking the transaction in state court. Absent full discovery, and perhaps eventual trial, we cannot determine whether deception can be proved.

Alabama Farm's allegation that the defendants caused the corporation to purchase its shares at artificially inflated prices also adequately asserts the "injury" required for a 10b–5 violation. While current market price is commonly considered a fair measure of value, *see, e. g., Kaufmann v. Lawrence,* S.D.N.Y.1974, 386 F.Supp. 12, aff'd, 2 Cir. 1975, 514 F.2d 283, this cannot be the measure if the market is distorted by the manipulation. If market price were always considered a fair measure of value, most, if not all, manipulative devices would not be subject to sanction under Rule 10b–5. Manipulation may affect the price even of stock listed on the New York Stock Exchange and traded in large volume; it obviously could have greater impact on the stock of a company traded only over the counter and in relatively small quantities.

Therefore, the argument that AMFI was paying only the market price is plausible, but sophistic. AMFI's stock was traded only over the counter. The number of transactions were, apparently, few. AMFI was certainly the largest buyer in the market and perhaps, save for Alabama Farm, the only one. What AMFI was willing to pay may have established the market. What would have been a fair price, or the market price absent the influence of AMFI on the market, is, at this time, only a matter of conjecture. It is at this stage, too, a non-sequitur to conclude that, because the stock at one time sold at $45, purchases executed later at an average cost of $8.41 were not at an inflated price. It is conceivable that, but for the alleged scheme, the price at the later date might have averaged $2.00.

It is the vice of the summary judgment at this stage that it was granted before all the disputed facts were known.

The defendants have thus far failed to meet their burden of establishing the absence of any genuine issue of material fact regarding their alleged scheme to inflate the price of AMFI shares. Even though Alabama Farm did not have a full opportunity to conduct discovery, it did uncover some circumstantial evidence suggesting either a scheme to purchase AMFI stock at any price or purchases without regard for the relation of the price paid to the stock's value or to the effect of that price on the market. For example, there was evidence of steady buying by AMFI,[12] and documents obtained from AMFI might lead a trier of fact to conclude that in some instances inflated prices were paid.[13] In addition, the

---

**12.** After its first two purchases in January, 1974, AMFI steadily bought over the course of four months, failing to make purchases on only 8 days that the market was open. AMFI might well have been following a policy of steady purchases in small amounts in order to avoid disrupting the market for its stock, and to keep the price down; if so, its actions would be blameless. *See* 3 L. Loss, Securities Regulation at 1551. However, its actions are also susceptible to the inference that it was attempting to support the market over a longer time period than would be the case if it made less frequent, but larger, purchases.

**13.** When AMFI began its stock repurchase plan in January, 1974, its first two purchases were made at a price of approximately $6.73 per share. After AMFI's steady purchases during the first four months of 1974, the price of AMFI stock rose, and thereafter AMFI made no purchase below $7.25 per share. In one instance AMFI apparently paid as much as $30.12 per share, as its documents show an expenditure of $69,300 for 2,300 shares.

AMFI made no purchases during May, June and July, but actively resumed them in August, 1974. During August the stock was purchased for an average of $8.50 per share, but AMFI's records indicate that it purchased some shares at a price of $22.19 per share and others at a price of $14.18 per share.

stock repurchase program apparently did cause a serious deterioration of AMFI's policyholder surplus, prompting the Florida Department of Insurance to write AMFI on February 21, 1975 directing it to cease its repurchases. This deterioration in its policyholder surplus occurred at a time, late 1974, when AMFI was also experiencing investment reverses that could have resulted in substantial charges to its statutory capital and surplus if the Department of Florida had deemed the investments to be non-admitted assets.[14] Such charges, at least in conjunction with the depletion in statutory capital caused by the stock repurchase program, might have drastically affected AMFI's ability to write new business.[15] The timing of the repurchase program and the tax incurred as a result of the program's implementation are also circumstantial evidence from which it might be inferred that the defendants were inflating the price of AMFI stock in order to maintain their control over the corporation or were acting in the knowledge that such inflation would be the necessary result of their conduct. The program was undertaken at the same time as Alabama Farm was making substantial purchases of AMFI stock, and caused AMFI to incur $695,142 in federal income taxes in 1974 alone.[16] Because the inferences to be drawn from these facts are disputed, we cannot determine whether the evidence would support the thesis that there was a scheme to maintain corporate control at any price or that the effect of the repurchase plan, as carried out, was to inflate the price of the stock.

■ Although the defendants presented affidavits and excerpts from the minutes of meetings of AMFI's Board of Directors to support their assertion that the repurchase program was undertaken simply as a good investment, this was insufficient to eliminate a genuine issue of fact as to the scope and predictable effect of the repurchase program. See generally 3 L. Loss, Securities Regulation at 1552–53 (2d ed. 1961). These issues involve subjective factors such as the knowledge available to the defendants and their intentions in pursuing the program; determination of these issues may require a full trial to enable the trier of fact to observe the demeanor of the witnesses, particularly during cross-examination see, Slavin v. Curry, supra; in conjunction with the genuine issue of fact presented concerning whether the corporation was "injured" by the alleged scheme, they warrant at least the opportunity to continue discovery, for the limited evidence presented by the defendants might have

14. AMFI's 10–K filed with the Securities and Exchange Commission in 1974 revealed that one of the projects to which AMFI had made a $3,000,000 mortgage loan was in Chapter X proceedings and AMFI was not then accruing interest on the loan. Additionally, the 10–K indicated that AMFI had received a letter from the Florida Department of Insurance dated March 7, 1975 requesting a meeting with AMFI officials because, as of December 31, 1974, AMFI had $8,700,000 worth of mortgage loans outstanding upon which interest was overdue more than three months. A meeting was mandated because the value of these mortgages exceeded AMFI's current surplus. If the Department had treated the mortgage loans as non-admitted assets, it could have resulted in the statutory insolvency of AMFI; at the end of 1974 the statutory capital and surplus of AMFI totaled only $3,690,996, approximately 42% of the value of the mortgage loans in default.

15. See footnote 5, supra.

16. Under the provisions of the Life Insurance Company Income Tax Act of 1959, Pub.L. 86–69, June 25, 1959, 73 Stat. 112, as amended, an insurance company may place a designated amount of earnings in a "Policyholders' Surplus Account" and avoid paying tax on this income. When distributions are made from this account, such as when an insurer purchases its own shares, the amount of the distribution is added to taxable income for that year, resulting, in effect, in the payment of income taxes on old earnings at corporate income tax rates. See 26 U.S.C. §§ 801 et seq.

A life insurance company may accumulate income in this account over a number of years. Alabama Farm introduced the affidavit of a witness who testified that most companies strenuously avoid a distribution and resultant taxation on these earnings. In repurchasing its shares, however, AMFI distributed the entire balance of its Policyholders' Surplus Account, voluntarily triggering federal income taxes in one year of $695,142. Purchases made by AMFI in 1975 will receive similar tax treatment.

been rebutted if Alabama Farm had been allowed complete discovery, or even if it simply had been allowed access to the complete minutes of AMFI's Board of Directors' meetings. Alabama Farm may be unsuccessful in this action, but it is at least entitled to a fair opportunity to develop its case.[17]

█ We are well aware of the fact that the mere threat of discovery may cause substantial expenses to be incurred by litigants. In class actions in particular discovery can be used to coerce defendants. Flimsy cases are sometimes undertaken for just such a purpose. However, because the opportunity to have a full trial turns on the presence of still-disputed issues of material fact, a suit that asserts a tenable legal claim must not be aborted. Although Alabama Farm's suit is premised, at this point, on unproved inferences from circumstantial evidence, it states a cause of action and involves disputed issues of fact; therefore, under the Federal Rules of Civil Procedure, Alabama Farm has a right at least to further discovery. *See Subin v. Goldsmith, supra,* 224 F.2d at 761.

### III. *The Alleged Violations of § 14(a) and Rule 14a–9*

Alabama Farm alleged numerous misstatements and omissions in the proxy materials and supplemental proxy materials issued by AMFI. On consideration of these materials, the district court found that Alabama Farm's allegations were ill-founded. We agree.

None of the alleged misrepresentations and omissions in the proxy materials concerned the adequacy of the disclosure made regarding the scope of the repurchase program or how it would be carried out. In its amended complaint, Alabama Farm did not assert that the proxy statement should have

disclosed the alleged intent of the directors to inflate the price of AMFI stock, or that this would necessarily be the result of their actions. If such issues had been raised in the pleadings, summary judgment would have been improper. However, summary judgment was appropriate with respect to the allegations that Alabama Farm did make.

For the reasons set forth above, the grant of summary judgment for the defendants on Count I of the amended complaint is REVERSED, and the grant of summary judgment on Count II is AFFIRMED.

SKELTON, Senior Judge, concurring in part and dissenting in part:

I agree with the holding of the majority that American Fidelity (AMFI) did not violate § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1970), and Rule 14a–9 of the SEC, 17 C.F.R. § 240.14a–9 (1976) in the mailing of proxy and supplemental proxy statements, because, as held by the district judge, there were no significant misstatements or omissions in the proxy materials.

I also agree with the decision of the majority that AMFI succeeded in establishing the absence of any genuine issue of material fact as to the subjective motivation of its directors and officials in adopting the repurchase program and as to the effect of the program on the company's capital and surplus. The majority correctly approved the action of the district court in finding that the undisputed facts show that the company had adequately disclosed the existence, size and effect of the program, and that Rule 10b–5 does not require corporate directors and officers to disclose their subjective motivation in adopting a stock repurchase program.

---

**17.** It may be, as the dissent argues, that Alabama Farm is engaged in harassment as a result of frustration of its efforts to gain control of AMFI. The facts with respect to this are, like many others in this case, not known. Alabama Farm brings this action not on its own behalf but on behalf of AMFI, as a derivative stockholder's action. The deception it alleges

was, it contends, worked on the corporation. We do not here decide that the suit has merit; we simply hold that its dismissal came before the plaintiffs had adequate opportunity for discovery and, therefore, before it could be known whether there were any genuine disputes as to material facts.

I also agree that Counts III and IV involving state claims were properly dismissed.

However, I cannot agree with the majority's decision to reverse the case for a hearing on Alabama Farm's allegations that the repurchase plan was a device to manipulate the market in AMFI's shares and thereby inflate the market price of the shares in order to preserve the defendant's control over the AMFI, and that as a part of this scheme the defendants failed to disclose the inflationary effect AMFI's repurchases would have on the market price of its outstanding shares, all in violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5. In my opinion, there is no genuine issue as to any material fact regarding these allegations of Alabama Farm and, therefore, a new trial is not warranted.

The majority correctly states:

"The Supreme Court has cautioned that ' "[m]anipulation" ' is ' "virtually a term of art when used in connection with securities markets." ' *Santa Fe Industries, supra,* 430 U.S. at 476, 97 S.Ct. at 1302, 51 L.Ed.2d at 493, quoting *Ernst & Ernst v. Hochfelder,* 1976, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668, 680. 'The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by *artificially* affecting market activity.' (Emphasis supplied). *Santa Fe Industries, supra,* 430 U.S. at 476, 97 S.Ct. at 1302, 51 L.Ed.2d at 493–494. 'Manipulation' has referred, in general, to devices used to induce investment in a company's stock, not to devices implemented to discourage such investment."

Notwithstanding the above decisions of the Supreme Court, the majority takes the opposite view and holds that "manipulation by a corporation refers to devices used by it to *discourage* investment by others in its stock, and that such conduct by AMFI in the instant case acted as a deceit or worked as a fraud on AMFI or on those who have invested in its stock. I do not agree.

There was no deceit nor fraud practiced by AMFI in connection with its repurchase plan. There is no allegation by Alabama Farm of any fact that shows any purpose, plan or intent on the part of AMFI to inflate the market price of its stock by its repurchase plan. Furthermore, the execution of the plan by AMFI did not inflate the market price of its stock. The facts show that the stock was originally issued for $25 a share. Later, and prior to the time of the repurchase plan, it reached $45 a share. Thereafter, it fell to $10 a share. AMFI repurchased its stock for an average of $8.41 a share. Where is the inflated price?

Also, it should be pointed out that Alabama Farm purchased 300,000 shares of AMFI stock (approximately 20% of the then outstanding shares) for the total sum of $2,530,000.00. No one forced it to buy this stock. We can assume that it made these purchases voluntarily and at prices that were satisfactory to it. Where was the deceit or the fraud? In my opinion, they were totally lacking. There was no violation of § 10(b) or Rule 10b–5 by AMFI.

The majority holds that there is a question of fact as to whether AMFI practiced deception in its initial press release that its purchases would be carried out in a manner that would not unduly affect the market. As a matter of fact, this is exactly what AMFI did. It purchased the stock in small lots over a long period of time. No one was deceived or misled. The price of the stock was not inflated by reason of its purchases.

I agree with the decision of Judge Tjoflat when he, acting as a district judge, granted summary judgment for the defendants on this phase of the case on the ground that Rule 10b–5 was not violated because there was no "deception" of or "injury" to the plaintiffs in connection with the repurchase program. I would add that there is no genuine issue of any material fact on this part of the case.

I would affirm the judgment of the district court on both Count I and Count II.[1]

1. In my opinion, this case is much ado about nothing and borders on being frivolous. It is obvious that Alabama Farm evolved a plan to take control of AMFI one way or another. At

first it sought to do this by buying 300,000 shares of AMFI's stock. When this plan failed to produce the desired results, it embarked on a course of conduct involving legal harassment, coercion and intimidation to gain control of AMFI. All of this is shown by Alabama Farm's pleading and conduct whereby it filed two suits in Federal courts in two different states and a third suit in a state court and in connection with such suits, which were consolidated into the present case, it attempted to take 38 depositions and filed 15 motions in connection therewith. These motions were obviously without merit, as the district court never acted on them. As a part of its case, Alabama Farm is making demand on AMFI for $3,423,078 in damages without alleging any fact that would entitle it to even $1 in damages. However, the making of the claim in such a large amount is itself an harassment and an intimidation. It appears to me that AMFI has done no wrong and that Alabama Farm is the bad actor in this scenario. A reversal of this case would enable Alabama Farm to subject AMFI to more harassment and intimidation. I do not think we should allow our courts to be used for such purposes.