Mollie G. PIN, Plaintiff,

v.

TEXACO, INC., et al.,
Defendants-Appellees,

v.

Jamey HOLSTEIN, Movant-Appellant.

No. 85–1326.

United States Court of Appeals,
Fifth Circuit.

July 14, 1986.

Rehearing and Rehearing En Banc
Denied Aug. 11, 1986.

W.D. Masterson, Kilgore & Kilgore, Christopher M. Hewitt, Robert M. Thornton, Dallas, Tex., for movant-appellant.

Dee J. Kelly, Kelly, Appleman, Hart & Hallman, Janice A. Schattman, Fort Worth, Tex., for Bass.

Eric M. Roth, Wachtell, Lipton, Rosen & Katz, New York City, for Texaco, Inc.

G.D. Gingold, Fort Worth, Tex., pro se.

Before THORNBERRY, RANDALL and POLITZ, Circuit Judges.

RANDALL, Circuit Judge:

Jamey Holstein appeals from an order of the United States District Court for the Northern District of Texas denying his motion to intervene pursuant to Fed.R.Civ.P. 24. We affirm.

I.

This lawsuit arises out of a stock transaction that has come to be known as "greenmail." In short, Holstein alleges that a group of individuals and entities headed by Bass Brothers Enterprises, Inc. ("Bass group") bought a large number of

shares in Texaco, Inc., on the open market. When the Bass group had accumulated a substantial block of shares—about 9.9% of the outstanding total—it purportedly threatened Texaco management with a tender offer for control of the company unless management policies were altered. In that event, the Bass group apparently would replace existing Texaco management. Ultimately, the incumbent Texaco management agreed for Texaco to buy out the Bass group's shares at a premium over market price.

Several shareholders of Texaco sought to challenge the transaction, most in derivative actions under principles of state corporations law relating to fiduciary duties, in various state and federal courts. Mollie Pin, the original plaintiff in this case, filed a complaint that set forth only state law causes of action. Pin, however, sold her shares of Texaco stock while the action was pending, and her counsel moved for her to be dismissed as plaintiff. However, rather than let the lawsuit expire, Pin's counsel moved to allow Holstein, another Texaco shareholder, to intervene. The proposed complaint in intervention at that time, like the original complaint, alleged only a violation of state law.

At about the same time, a Delaware state court, where numerous other derivative actions challenging this transaction were pending, certified a class action. A settlement was reached by the parties and approved by the trial court regarding all state law causes of action; that action, unless reversed on appeal,[1] effectively disproposed settlement was reached by the parties and approved by the trial court regarding all state law causes of action; that action unless reversed on appeal,[1] effectively disposed of the state law claims asserted in Holstein's motion to intervene. However, the state court's order expressly declined to foreclose litigation of federal securities law claims. Shortly after the hearing on the proposed settlement, Holstein's counsel filed an amended motion to intervene on behalf of Holstein, which added to the state law cause of action one count under § 10(b) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78j(b),[2] and Rule 10b–5, 17 C.F.R. § 240.10b–5, and one count under § 13(e) of the Act, 15 U.S.C. § 78m(e),[3] and Rule 13e–4, 17 C.F.R. § 240.13e–4.

The district judge denied the motion to intervene. He concluded that intervention was inappropriate because neither of Holstein's proposed federal claims stated a cause of action. Further, he sanctioned Holstein's counsel under Fed.R.Civ.P. 11 for filing the "decidedly frivolous" motion to intervene.

1. The Delaware state court settlement has since been approved by the state Supreme Court. *Polk v. Good*, 507 A.2d 531 (Del.1986).

2. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

3. Section 13(e)(1) provides:

(e)(1) It shall be unlawful for an issuer which has a class of equity securities registered pursuant to section 78*l* of this title, or which is a closed-end investment company registered under the Investment Company Act of 1940, to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or for the protection of investors, may adopt (A) to define acts and practices which are fraudulent, deceptive, or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices. Such rules and regulations may require such issuer to provide holders of equity securities of such class with such information relating to the reasons for such purchase, the source of funds, the number of shares to be purchased, the price to be paid for such securities, the method of purchase, and such additional information, as the Commission deems necessary or appropriate in the public interest or for the protection of investors, or which the Commission deems to be material to a determination whether such security should be sold.

## II.

The issue in this case, one of civil procedure, is whether the trial court's denial of Holstein's motion to intervene under Fed. R.Civ.P. 24 was proper. Holstein raises two objections to the district court's order. As a threshold matter, he complains that the district court's decision suffers "procedural infirmities" because the order was entered before discovery on the federal claims had been completed. However, the plain fact is that Rule 24(c) obligates a district judge to make an assessment of whether the proposed intervenor's complaint states a cause of action, at least when the motion to intervene is opposed, and where, as here, the complaint in intervention adds substantive claims that no other party asserted. *Diehl v. United States*, 438 F.2d 705, 711 (5th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 67, 30 L.Ed.2d 59 (1971); 7A C. Wright & A. Miller, *Federal Practice & Procedure* § 1914, at 569 (1972) ("proposed pleading must state a good claim for relief"); *see also Rhode Island Federation of Teachers v. Norberg*, 630 F.2d 850, 854–55 (1st Cir. 1980) ("intervention under Rule 24 is conditioned by the Rule 24(c) requirement that the intervenor state a well-pleaded claim or defense to the action"); 3B J. Moore, *Moore's Federal Practice* ¶ 24.14, at 24–162 (1982) (proposed complaint of intervenor "must state a well pleaded claim or defense").

Thus, as a threshold matter, the district judge must determine whether the intervenor's complaint states a cause of action before he turns to a consideration of the factors listed in Rule 24(a) and (b) governing whether intervention is appropriate. The determination of whether the proposed intervenor's complaint states a cause of action is controlled by the "general rules on testing a pleading"; the factual allegations of the complaint are assumed to be true, *Hishon v. King & Spalding*, 467 U.S.

69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), and the pleading is construed liberally in support of the pleader. 7 C. Wright & A. Miller, *supra*, § 1914, at 569–70; *see Mendenhall v. M/V Toyota Maru No. 11*, 551 F.2d 55, 56 (5th Cir.1977). But "[i]t is a problem of substantive law, of course, as to whether a good claim or defense is stated." 3B J. Moore, *supra*, ¶ 24.14, at 24–163. Thus, Holstein's contention that the district judge should have allowed discovery on his claims before ruling on the motion to intervene is as irrelevant as it would be if made in the context of a motion to dismiss pursuant to Fed.R. Civ.P. 12(b)(6).

Holstein further challenges the district court's determination that his proposed complaint failed to state a cause of action. Holstein's complaint alleges the following facts, which we must assume to be true.[4] On January 19, 1984, the separate members of the Bass group filed Schedule 13D's with the Securities and Exchange Commission ("SEC"), indicating that they had acquired over five percent of Texaco's outstanding common stock. On February 28, 1984, the Bass group stated in another 13D filing that it had increased its stock in Texaco to 9.9 percent. Although "none of the Bass group had caused or threatened to cause any harm to Texaco," after learning of the Bass group's acquisition of Texaco shares "Texaco management negotiated, approved and consummated a scheme and agreement with the Bass [group] to use Texaco cash and securities ... to repurchase the stock held by the Bass group, at an inflated price." Complaint ¶¶ 12–13. Texaco management acted "in order to eliminate the voting power of the 9.9 percent block of common stock that had been accumulated by the Bass group," and "in order to create a large block of voting preferred stock subject to the sole control of Texaco management for the primary purpose of perpetuating Texaco manage-

---

**4.** In his brief on appeal and at oral argument, Holstein added numerous factual allegations to those set forth in the complaint, such as "secret meetings," "price supports," pools, and employing numerous different brokers. The brief on appeal, of course, is not the appropriate place to amend a complaint. *Hanson v. Town of Flower Mound*, 679 F.2d 497, 504 (5th Cir.1982). Accordingly, we will consider only the factual allegations of the complaint.

ment in office." *Id.* ¶ 13. These acts are said to have constituted "fraud and deceit upon the remaining shareholders," in violation of § 10(b) and Rule 10b–5: the Bass group, by "threatening to challenge the positions and policies of Texaco management, extorted substantial amounts of corporate money and other assets of Texaco through manipulation and 'greenmail....'" *Id.* ¶ 22. It is further alleged that Texaco's purchase of the Bass group's holdings was a tender offer that did not comply with the requirements of § 13(e) and Rule 13e–4.

It may be, as Holstein states in his brief, that "[c]ommentators have virtually unanimously condemned the practice of greenmail and decried its harmful effects upon both corporate health and public investor wealth." It may be that greenmail is a "disgrace," and "an extremely serious wrong looking for a remedy." We express no views on those assertions, as the issue before us is simply whether, under the facts Holstein alleges in his amended complaint, § 10(b) and § 13(e) of the Act were intended by Congress to provide a remedy.

*A. § 10(b) Claim.*

▆▆▆ Holstein's theory of recovery under § 10(b) is elusive, but must be pinned down in order to determine whether the complaint states a cause of action. In short, Holstein contends that the Bass group, "by threatening to challenge the positions and policies of Texaco management, extorted substantial amounts of corporate money and other assets of Texaco through manipulation and 'greenmail' (blackmail of corporate management for substantial amounts of corporate money or other assets by obtaining a block of securities)" in violation of § 10(b). Complaint ¶ 23. The complaint also states that Texaco itself violated § 10(b) when it repurchased the Bass group's holdings. Complaint ¶ 22. These allegations fall short of the types of wrongful conduct that § 10(b)

and Rule 10b–5 were intended to remedy. In order to state a cause of action under § 10(b), a plaintiff must plead *facts* that would amount to manipulation or deceptive conduct proscribed by that section and Rule 10b–5. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472–75, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977); *see Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972). "Manipulation" as used in § 10(b) is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by *artificially* affecting market activity." *Santa Fe,* 430 U.S. at 476, 97 S.Ct. at 1302 (emphasis added). *See Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 724 (5th Cir.1984). The SEC, whose interpretations of § 10(b) and Rule 10b–5 are entitled to some deference, recently defined the term: "In essence, a manipulation is intentional interference with the free forces of supply and demand." *In re Pagel, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 83,909, at 87,751 (S.E.C. Aug. 11, 1985).[5] The free forces of supply and demand cannot function without "full disclosure" and accurate representations, *Santa Fe,* 430 U.S. at 477–78, 97 S.Ct. at 1302–03; but "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern" of § 10(b). *Id.* at 478. Accordingly, misrepresentation or nondisclosure—an interference with the free flow of information on which the forces of supply and demand rely—is an essential element of a cause of action under § 10(b). *Madison Consultants v. FDIC,* 710 F.2d 57, 62 (2d Cir.1983); *Maldonado v. Flynn,* 597 F.2d 789, 793 (2d Cir.1979); *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623, 628 (D.Md.1982); Greene & Junewicz, *A Reappraisal of Current Regulation of Mergers and Acquisitions,* 132 U.Pa.L.

5. For example, a securities underwriter who controls wholesale pricing "to such an extent as to preclude an independent competitive market from arising" may engage in manipulative conduct. *Id.* at 87,750.

Rev. 647, 708–09 (1984); Note, *Greenmail: Targeted Stock Repurchases and the Management-Entrenchment Hypothesis,* 98 Harv.L.Rev. 1045, 1060 (1985); *see Schreiber v. Burlington Northern, Inc.,* 105 S.Ct. 2458, 2465 (1985) (in action under § 14(e) of Act "the term 'manipulation' ... requires misrepresentation or nondisclosure"); *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 4 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). "Mere conclusory allegations to the effect that defendant's conduct was fraudulent or in violation of 10b–5 are insufficient." *Segal,* 467 F.2d at 607 (quoting *Matheson v. White Weld & Co.,* 53 F.R.D. 450, 452 (S.D.N.Y.1971)); *see Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982); *cf.* Fed.R.Civ.P. 9(b).

The plain fact is that Holstein's complaint does not allege that any party to this transaction misrepresented or failed to disclose a material fact,[6] therefore, the complaint fails to claim that any party "manipulated" stock prices as that term is used in federal securities law. As to Texaco, the complaint alleges nothing more than corporate mismanagement and breaches of fiduciary duty that are traditionally a matter of state regulation. There is no assertion that "the target's directors either misrepresented the company's situation or failed to disclose material information." Note, *supra,* 98 Harv.L.Rev. at 1060. State law provides whatever remedy is available for shareholders' claims of this type, and " 'it is entirely appropriate in this instance to relegate [Holstein] to whatever remedy is created by state law.' " *Santa Fe,* 430 U.S. at 478, 97 S.Ct. 1303 (quoting *Cort v. Ash,* 422 U.S. 66, 84 (1975)). Accordingly, the complaint plainly fails to state a cause of action against Texaco for violation of § 10(b) and Rule 10b–5.

As to the Bass group, again there is no allegation of misrepresentation or deception. The complaint merely asserts that the Bass group purchased a large block of shares on the open market at market prices, and "extorted" assets from Texaco's management. There is no allegation that the "extortion" involved misrepresentations or omissions. Nothing "artificial," or outside the natural functioning of the market, is alleged in the complaint.[7] Although the complaint uses the term "manipulation," it merely states in a conclusory manner that the Bass group engaged in manipulation when it "extorted" money from Texaco. But "manipulation" is not a magic word whose use in a complaint automatically defeats a motion to dismiss.

---

**6.** Holstein asserts for the first time on appeal that the Form 13D's filed by the Bass group were misleading, in that it actually intended to greenmail Texaco all along, and did not acquire the Texaco stock simply "as an investment" as the Bass group's members stated in the 13D's. The allegations of false 13D's does not appear in the complaint. In oral argument before the district court, the judge asked whether there was any misrepresentation in the 13D's, and counsel for plaintiff answered "No. I do not know of any misrepresentation or omission that was made by the Bass defendants in those filings." We do not consider these new allegations of false 13D's, because of the settled rule of appellate practice that precludes review of issues raised for the first time on appeal. *Donovan v. Hamm's Drive Inn,* 661 F.2d 316, 317 (5th Cir.1981).

We note that one commentator suggests that whether 13D's are false is properly a matter to be considered in an action under § 13(d) of the Act, 15 U.S.C. § 78m(d). "The shareholders could claim that the raider intended to greenmail the target all along and therefore violated § 13(d) when it did not disclose this intention in its 13D filing with the SEC." Note, *supra,* 98 Harv.L.Rev. at 1060 n. 76. However, several courts have held that § 13(d) does not provide a private right of action to shareholders for damages. *See, e.g., Sanders v. Thrall Car Mfg. Co.,* 582 F.Supp. 945, 960–61 (S.D.N.Y.1983), *aff'd,* 730 F.2d 910 (2d Cir.1984).

**7.** For this reason, Holstein's reliance on *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.,* 606 F.2d 602 (5th Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980), for the proposition that greenmail "constitutes" manipulation is misplaced. *Alabama Farm* stands for the settled proposition that § 10(b) proscribes "conduct designed to *deceive* or *defraud* investors." *Id.* at 612 (emphasis added). "Deception," however, requires misrepresentations or nondisclosure of facts, either by statements or by conduct. *Id.* at 611–12. Such allegations are entirely absent from the amended complaint in intervention in this case.

It may be, as Holstein argues, that greenmail is "an extremely serious wrong looking for a remedy." [8] But absent factual allegations that would amount to manipulative conduct, i.e., misrepresentation or nondisclosure, a complaint under § 10(b) does not provide a remedy because it does not state a cause of action.

### B. § 13(e) Claims.

Holstein's amended complaint asserts that Texaco violated § 13(e) of the Act and Rule 13e–4 promulgated under it. It states that the transactions between Texaco and the Bass group "constituted an unlawful tender offer" and that "such tender offer was not conducted in accordance with Section 13(e) and Rule 13e–4, [because] the remaining shareholders were not afforded an opportunity to tender their shares of stock pro rata to Texaco at the prices offered and paid to the Bass entities." Complaint ¶ 26. Once again, we must accept the factual allegations of the complaint as true to pass on this appeal, and for the purpose of this opinion we will assume that Holstein has standing to raise this claim.

Section 13(e), commonly known as the Williams Act, "was adopted in 1968 in response to the growing use of cash tender offers as a means for achieving corporate takeovers." *Piper v. Chris-Craft Industries*, 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). It sets forth disclosure requirements and provides specific benefits for tendering shareholders, and contains a broad antifraud provision. *Id. See also* Rule 13e–4(b)(1). Holstein contends that Texaco violated the Act when it did not offer to repurchase Texaco from all its shareholders at the same premium given the Bass group, Rule 13e–4(b)(3).[9]

The policy behind the Williams Act—protection of shareholders in a target company by ensuring that they are treated fairly and equally when they decide whether to tender their shares, *see* 11A pt. 1A *Business Organizations-Securities Regulation* § 7A.03[1], at 7A–47 (A. Sommer ed. 1985)—seems to have little to do with the situation in the case *sub judice*. This is not a case in which poorly informed shareholders were induced to tender their shares to Texaco through misleading or incomplete information, which is the evil that § 13(e) was enacted to remedy. Be that as it may, we agree with the district court that the transaction between Texaco and the Bass group was not a tender offer; therefore, the Williams Act by the terms of Rule 13e–4 is inapplicable to this deal.

The Williams Act amendments do not define the term "tender offer," and the SEC "has steadfastly refused to supply a definition, 'since the dynamic nature of tender offers requires administrative and judicial flexibility in determining what types of transactions should be subject to the Act and these regulations.'" *Id.* at 7a–46, 47 (quoting *Exch. Act Rel. No. 15,548* (1979)). *See also Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 598 (5th Cir.),

---

8. The Office of Chief Economist of the SEC recently prepared a report on greenmail, on which Holstein's counsel relies heavily. *Impact of Targeted Share Repurchase (Greenmail) on Stock Prices*, Fed.Sec.L.Rep. (CCH) ¶ 83,713 (Sept. 11, 1984). The report concludes that greenmail has "negative net effects" on stock prices. *Id.* at 87,179. However, that conclusion is not relevant to whether § 10(b) and Rule 10b–5 provide a federal remedy for that injury under the allegations of this complaint. Indeed, the report notes that the SEC proposed legislation to restrict target company repurchases. *Id.* at 87,174. Numerous bills—all "based on" the SEC proposal—were introduced in the 98th Congress to limit or outlaw greenmail. *See* Note, *supra*, 98 Harv.L.Rev. at 1045 n. 5. The fact that the SEC has proposed these reforms provides implicit support for the conclusion that it does not believe that current federal law provides a remedy for greenmail, and Congress' failure to amend the statute in light of that interpretation provides limited support that it does not view § 10(b) as prohibiting greenmail. *See Canada Packers, Ltd. v. Atchison, T. & S.F. Ry. Co.*, 385 U.S. 182, 184, 87 S.Ct. 359, 360, 17 L.Ed.2d 281 (1966); N. Singer, *Sutherland, Statutory Construction* § 49.10, at 407–08 (rev. 4th ed. 1984).

9. Holstein asserts in his brief on appeal that Texaco violated the antifraud provision of Rule 13e–4 "for the same reasons" that the transaction violated Rule 10b–5. This allegation simply does not appear in the complaint, therefore we do not consider it.

cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). Courts apply several tests to determine whether a stock purchase is a tender offer, for application of either § 13 or § 14 of the Act. First, the SEC has formulated an eight-factor analysis, first applied in *Hoover Co. v. Fuqua Industries,* Fed.Sec.L.Rep. (CCH) ¶ 97, 107 (N.D. Ohio June 11, 1979): (1) whether there is an active and widespread solicitation of public shareholders for shares of an issuer; (2) whether the solicitation is made for a substantial percentage of the issuer's stock; (3) whether the offer to purchase is made at a premium over the prevailing market price; (4) whether the terms of the offer are firm rather than negotiated; (5) whether the offer is contingent on the tender of a fixed minimum number of shares, and perhaps, subject to the ceiling of a fixed maximum number to be purchased; (6) whether the offer is open for only a limited period of time; (7) whether the offerees are subject to pressure to sell their stock; and (8) whether public announcements of a purchasing program concerning the target company precede or accompany a rapid accumulation of large amounts of target company securities. *Id.* at 96,148. This analysis has been applied by the courts in *SEC v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 949–52 (9th Cir.1985); *Energy Ventures, Inc. v. Appalachian Co.,* 587 F.Supp. 734, 740 (D.Del. 1984); *Zuckerman v. Franz,* 573 F.Supp. 351, 358 (S.D.Fla.1983); and *Wellman v. Dickinson,* 475 F.Supp. 783, 823–26 (S.D.N.Y.1979), *aff'd on other grounds,* 682 F.2d 355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983).

A second test, adopted by the Second Circuit in *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47 (2d Cir.1985), a case under § 14 of the Act, cautions against the elevation of the SEC's eight-factor analysis to a "mandatory 'litmus test.'" The Second Circuit in *Hanson Trust* held that "the question of whether a solicitation constitutes a 'tender offer' within the meaning of § 14(d) turns on whether, viewing the transaction in light of the totality of circumstances, there appears to be a likelihood that unless the preacquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them." *Id.* at 57. *See also* Note, *The Developing Meaning of "Tender Offers" Under the Securities Exchange Act of 1934,* 86 Harv.L.Rev. 1250, 1281 (1973) ("a tender offer should include any offer to purchase securities likely to pressure shareholders into making uninformed, illconsidered decisions to sell").[10]

Holstein's proposed complaint plainly fails muster under either of these tests. The complaint alleges the following facts. This transaction was made privately to a very small percentage of Texaco's shareholders. There is no assertion of pressure by Texaco on any member of the Bass group to sell hastily. The complaint implies that the sellers were highly sophisticated. There is no allegation of "active or widespread advance publicity or public solicitation, which is one of the earmarks of a conventional tender offer." *Hanson Trust,* 774 F.2d at 58. The complaint does not state that there was a general time limit within which the shares were to be given to Texaco in order for the offer to be accepted. In short, the conclusory allegation of a violation of § 13(e) of the Act, devoid of any facts that might, if proven true, establish that a tender offer had occurred, plainly fails to state a cause of action. The allegations of the complaint could establish nothing more than a pri-

**10.** A third test is set forth in *S–G Securities Co. v. Fuqua Investment Co.,* 466 F.Supp. 1114, 1125 (D.Mass.1978): "where there is (1) a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target company for purposes of acquiring control thereof; and (2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases; such actions constitute a tender offer...." *See also* Einhorn & Blackburn, *The Developing Concept of "Tender Offer": An Analysis of the Judicial and Administrative Interpretations of the Term,* 3 N.Y.L.S.L.Rev. 379, 386–87 (1978); *Business Organizations, supra,* at 7A–48.

vately negotiated transaction, which does not qualify as a tender offer, and is thus not actionable under § 13(e). *See Hanson Trust,* 774 F.2d at 56 (listing cases); *Business Organizations, supra,* at 7A–49 & n. 24.

### III.

We turn to the issue of the propriety of sanctions under Fed.R.Civ.P. 11.[11] Sanctions under Rule 11 are designed to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Notes of Advisory Committee for 1983 Amendment. Rule 11 sets forth an objective standard: contentions in a pleading may be made only "after reasonable inquiry" that the claim is "warranted by existing law or good faith argument for the extension, modification, or reversal of existing law." *See Ginther v. O'Connell,* 791 F.2d 1151, 1155 (5th Cir.1986); *Hale v. Harney,* 786 F.2d 688, 692 (5th Cir.1986); *Davis v. Veslan Enterprises,* 765 F.2d 494, 497 (5th Cir.1985). However, "[t]he rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Advisory Committee Note to Rule 11. Our review of the district court order is limited to determining whether it abused its discretion in awarding sanctions. *Ginther,* 791 F.2d at 1153; *Veslan Enterprises,* 765 F.2d at 498.

We have discussed above the patent insufficiency of the federal law claims in light of the allegations of the complaint. The claims certainly are not warranted by existing law, nor could it be reasonably argued that the claims are warranted by an extension of the law, in light of *Santa Fe* and the numerous cases construing § 13(e). Further, a most discouraging aspect of this litigation is the hasty inclusion of the federal law claims, almost one year after the case was commenced, shortly after it appeared likely that the state law claims in the action would be foreclosed by the Delaware settlement. It is entirely sensible to conclude, as did the district court, that the claims "appear to be nothing more than an end run around the anticipated ruling [approving a settlement] in Delaware, which counsel understood would eliminate the purely state claims in the earlier complaint filed in this case." The district court concluded:

> Counts I and II were added in a desperate effort to keep this lawsuit alive after the likely approval by the Delaware court of the [Delaware state court] settlement. Oral argument only made it more obvious that intervenor's counsel is grasping at straws in an effort to keep this lawsuit afloat.

The record supports this conclusion. The brief accompanying Holstein's motion to intervene is devoid of any discussion of the requirement of Fed.R.Civ.P. 24(c) that an intervenor's complaint must state a cause of action. There is no explanation whatever of the tardy addition of the federal law counts to Holstein's complaint.[12] There is no allusion to the requirements of a well-pleaded § 10(b) or § 13(e) cause of action in that brief. There is no citation to *Santa Fe* or to the numerous cases applying the

---

**11.** Rule 11 provides in part:
   The signature of an attorney or other party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after a reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to

cause unnecessary delay of needless increase in the cost of litigation.

**12.** The only explanation in oral argument before the district court for the late inclusion of the federal claims was that counsel "realized" when reviewing discovery material generated in the Delaware action that "there were federal causes of action that were not determined under state law, that could not be determined under state law, that could not be determined by the Delaware Court."

Williams Act. (There was, however, a flurry of discovery motions accompanying Holstein's proposed amended complaint.) Oral argument before the district court on the motion to intervene provided further evidence of the elusive character of the theory of the amended complaint.

Under these circumstances, the district judge was fully justified in concluding that counsel failed to investigate reasonably whether the amended complaint in intervention stated a cause of action, and that the claims were not warranted by existing law or a good faith argument for the extension of existing law. Testing, as we must, counsel's conduct "by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted," we cannot conclude that the district court abused its discretion in determining that sanctions were appropriate under Rule 11.

### IV.

For the foregoing reasons, the order of the district court dismissing Pin's action with prejudice and denying Holstein's motion to intervene pursuant to Rule 24 is AFFIRMED.