**Andrew L. SMITH, Plaintiff-Appellant,**

v.

**Jack R. AYRES, et al.,
Defendants-Appellees.**

No. 87–1388.

United States Court of Appeals,
Fifth Circuit.

June 3, 1988.
Rehearing Denied July 6, 1988.

F. Dean Armstrong, Flossmoor, Ill., for plaintiff-appellant.

Carl David Adams, Adams & Francis, Dallas, Tex., for Clayton Smith.

Edwin E. Wright III, Ronald D. Wren, Stradley, Schmidt, Stephens & Wright, Dallas, Tex., for defendants-appellees.

Before GARZA, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Andrew Smith sued his brother Clayton and others alleging securities fraud and RICO violations arising out of a fight for control of a family business. The district court dismissed the securities-fraud claims, both those brought individually and those brought on behalf of the corporation. The court also dismissed the RICO claim for inadequate pleading and declined to grant leave to amend. We affirm the judgment on the individual securities claim, but reverse the dismissal of the derivative claim. We affirm the district court's ruling on the RICO claim.

I

Smith Protective Services is a family-owned corporation in Dallas, Texas. In 1977, Andrew Smith was the President and Chairman of the Board and owned approximately 26 percent of the corporation's stock. The other owners were his mother, Coralie, 22 percent, and his brothers, Clayton and Mark, with 26 percent each.

In June, 1977, Andrew accused Clayton of embezzling money from the business and the corporation filed suit. SPS' general counsel and director, Dallas attorney

Jack Ayres, represented the corporation. In the settlement of the suit, the corporation released any claim it had against Clayton in exchange for Clayton's agreement to sell his stock back to SPS. After completing the stock redemption, Andrew and Mark each held 35 percent of the outstanding shares, while Coralie held 30 percent. With their combined majority stake, Andrew and his mother had effective control.

Andrew alleges (in conclusory terms) that in 1983 Clayton set about to recover his interest in the company, and enlisted the support of Mark and Ayres. The plan was said to be to force the board to reissue Clayton's shares in the company under the theory that the prior settlement agreement had been obtained by fraud. For this purpose, Clayton retained Gerry Wren, a Dallas lawyer. Clayton intended to have Wren send a letter demanding return of his shares.

On July 20, Clayton related his plan to Ira Tobolowsky, another Dallas attorney who was also an SPS director. The next day, July 21, Tobolowsky telephoned Jack Ayres twice to discuss Clayton's demand letter. Tobolowsky later called Wren's office and learned that Wren left town without sending the letter. In a conference call that included Tobolowsky, Wren's secretary, and Ayres, Tobolowsky told Ayres that Wren had not sent the letter. Ayres then dictated a letter to Wren's secretary. When Wren's secretary learned that the recorder had failed to record, she called Tobolowsky. Tobolowsky initiated another conference call, and Ayres successfully dictated the letter to another secretary.

Later the same day Ayres received the demand letter which bore Wren's signature and which was typed on his firm's stationery. Ayres presented the letter to the Board of Directors and recommended that the Board accede to Clayton's demands.

Ayres did not, however, disclose that he was the author of the letter. The Board followed his recommendation by a vote of 7–2, with only Andrew and Coralie opposed. The decision gave Clayton and Mark a 52 percent interest in the corporation. According to Andrew, they have used this control to mismanage the corporation and divert corporate assets for personal gain.

When in February, 1986, Andrew entered a plea of "no contest" to an indictment alleging cocaine possession, SPS filed suit in state court to divest Andrew of his shares in the corporation under a Texas law that assertedly prohibits felons from owning an interest in a licensed security agency. A Texas district court granted SPS an injunction requiring Andrew to sell his shares back to the corporation.[1] However, this decision was reversed on October 21, 1987, by the Texas Court of Appeals. The appellate court found that SPS had no standing to seek the injunction because SPS was seeking enforcement of a state-agency rule that the agency had not threatened to enforce.[2]

Andrew filed this federal suit alleging that Clayton, Mark and Ayres violated the antifraud provision of Rule 10b–5 of the securities laws[3] as well as the Racketeer Influenced and Corrupt Organizations Act.[4] The district court dismissed Andrew's individual 10b–5 claim because Andrew did not allege the element of reliance. The court reasoned that because Andrew voted against rescission, he did nothing differently because of the letter. The district court also held that Andrew had no standing to bring a derivative securities claim on behalf of the corporation because of the state court decision divesting Andrew of his shares in SPS; at that time the decision still was pending before the state court of appeals. The district court dismissed Andrew's RICO claim for failure to plead two or more predicate acts of racketeering as required by the statute. The court also

---

1. *Smith Protective Services, Inc. v. Texas Board of Private Investigators & Private Security Agencies,* No. 397,625 (Dist.Ct. of Travis County, 261st Judicial Dist., July 14, 1986).

2. *See Smith v. Smith Protective Services, Inc.,* No. 3–86–064CV, slip op. at 2 (Tex.App.—Austin, Oct. 21, 1987).

3. Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b); Rule 10b–5, 17 C.F.R. § 240, 10b–5.

4. 18 U.S.C. §§ 1961–68.

refused to grant Andrew leave to amend his complaint, finding that it would waste the resources of the court and the parties.

## II

## A

We affirm the district court's dismissal of the securities fraud claims brought by Andrew in his individual capacity. Andrew plead no facts that would support a finding that he relied on the statements he alleges to be fraudulent. As the Supreme Court recently reminded, proof of reliance is essential to a claim under Rule 10b–5 because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."[5] Here the district court correctly concluded that Andrew did not adequately plead reliance because even with true disclosure, he still would have voted against the issuance of shares to Clayton.

We are not persuaded by Andrew's arguments for a contrary result. We agree with the district court that Andrew is not entitled to a presumption of reliance. Following *Affiliated Ute Citizens v. United States*,[6] this Circuit has recognized that where the gravamen of the fraud is a *failure to disclose*, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance.[7] The presumption is a judicial creature. It responds to the reality that a person cannot rely upon what he is not told.

It follows that the first step in determining whether the *Affiliated Ute* presumption applies is to identify whether the plaintiff's claim is founded on a fraudulent omission. This in turn depends upon which of the three subsections in Rule 10b–5 forms the basis for the plaintiff's complaint. The Rule makes it illegal to do three things:

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

By the terms of the Rule, a presumption of reliance would not arise where the plaintiff's case is grounded in the second subsection. Subsection two requires disclosure only when necessary to make a statement made not misleading. For this reason, a subsection two claim always rests upon an affirmative statement of some sort, reliance on which is an essential element plaintiff must prove. Non-disclosure is relevant only as it makes the statements either false or misleading. By contrast, under the first and third subsections the duty not to engage in a fraudulent "scheme" or "course of conduct" could be based primarily on an omission. Hence, the presumption could be warranted only under subsections one and three, but not under subsection two.[8]

---

**5.** *Basic Inc. v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988).

**6.** 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

**7.** *See Shores v. Sklar*, 647 F.2d 462, 468 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359–60 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *see also Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir.1978) ("where a plaintiff alleges deception by defendant's non-disclosure of material information, the *Ute* presumption obviates the need for plaintiff to

prove actual reliance on the omitted information.").

**8.** This distinction has occasioned some confusion in the courts. Indeed, by discussing the *Affiliated Ute* presumption in the context of a Rule 10b–5(2) claim, our en banc opinion in *Shores* might have implied that the distinction does not exist. *See Shores*, 647 F.2d at 468. Yet, the holding of the case, as we made clear, was only that *"[i]f* the *Ute* presumption applie[d] to the[ ] disclosures," it had been rebutted by plaintiff's admissions. *Id.* (emphasis added). Moreover, a recent panel has reaffirmed the distinction:

[T]he division of 10b–5 actions into these two categories is justified by the Rule itself. Cases

■ Andrew's claim is not footed upon a specific subsection. However, even assuming that he has stated his claim under the first or third subsections and assuming that the fraudulent scheme or course of conduct primarily involved omissions, the district court was correct in its conclusion because the presumption was rebutted on the face of Andrew's complaint. As we explained in *Shores v. Sklar,*[9] the presumption of reliance is rebutted when the complaint admits that the plaintiff did not actually rely on defendant's alleged omission.[10] This principle applies here because the complaint admits that Andrew voted against issuing shares to Clayton.

We also reject the argument that even though Andrew's *vote* may have been unaffected by the Wren letter, he relied on the letter because had the fraud been disclosed, he would have sought an injunction against the Board's action. The theory is internally inconsistent: had the Wren letter not been presented or had it been presented with disclosure of its true author, there would have been no fraud on which to base injunctive relief. The only authority offered to support the theory is a line of cases in which fraudulent actions by controlling shareholders in merger transactions were held to be material because true disclosure would have led minority shareholders to seek their state-law appraisal remedies.[11] In those cases, however, the shareholders' remedy would not have been eliminated by the sought-for disclosure. In short, nothing in Andrew's complaint indicates that his individual actions were affected in any way by the alleged fraud.

■ Although the district court never reached the issue, the court also could have dismissed Andrew's individual securities-fraud claim because Andrew failed to allege that he was a "purchaser or seller" of securities. As the Supreme Court held in *Blue Chip Stamps v. Manor Drug Stores,*[12] such an allegation is essential to the plaintiff's standing in an action under Rule 10b-5. Yet Andrew did not buy or sell anything in connection with the disputed transaction. The fact that he was a stockholder in a corporation that may have bought or sold is not sufficient to give him standing in an individual capacity.[13]

### B

■ Although Andrew did not allege that *he* relied, the complaint alleged that the *corporation's* decision to issue shares to Clayton was based on the Wren letter; and, unlike Andrew, the corporation might be considered a "purchaser or seller" of securities.[14] The district court dismissed the derivative claim, however, on the basis of the state court judgment divesting Andrew of his shares in SPS. Because the state judgment has since been reversed, Andrew now has standing to pursue the derivative claim. Hence, we reverse the district court's judgment on the derivative claim and remand for further proceedings.

involving primarily a failure to disclose implicate the first and third subsections of Rule 10b-5; cases involving primarily a misstatement or failure to state a fact necessary to make statements made not misleading implicate the second subsection (which is the only subsection of the Rule that specifically mentions the active misrepresentation concept of prohibited conduct).
*Finkel,* 817 F.2d at 359-60 (footnote omitted).

**9.** 647 F.2d 462 (5th Cir.1981) (en banc).

**10.** *Id.* at 468.

**11.** *See Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Ins. Co.,* 606 F.2d 602, 613 (5th Cir.1979); *Goldberg v. Meridor,* 567 F.2d 209, 217-20 (2d Cir.1977).

**12.** 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**13.** *See Rathborne v. Rathborne,* 683 F.2d 914, 919 n. 16 (5th Cir.1982) ("where a corporation has been defrauded in a securities transaction, a shareholder does not have standing to bring a *direct* action under Rule 10b-5") (emphasis retained); *see also Blue Chip Stamps,* 421 U.S. at 738, 95 S.Ct. at 1926.

**14.** We have held that a corporation's issuance of its own treasury shares is a "sale." *Rekant v. Desser,* 425 F.2d 872, 877 (5th Cir.1970); *Broad v. Rockwell Intern. Corp.,* 614 F.2d 418, 437 (5th Cir.1980). Even if the transaction was characterized as a "rescission" of the prior repurchase rather than a new issue, the "economic reality" of the corporation's action was that shares were transferred to Clayton that he did not previously own. *Cf. Rathborne,* 683 F.2d at 920.

However, while the complaint stated a derivative securities-fraud claim against Ayres, we find that the pleading failed sufficiently to allege securities fraud on the part of Clayton or Mark Smith. We have adopted the prevailing view that the particularity requirement of Rule 9 applies to securities-fraud claims.[15] Conclusory allegations of a defendant's involvement are not enough to survive dismissal for failure to state a claim.

Judged by these standards, Andrew's complaint failed to state a claim against Clayton and Mark as direct participants in any fraud against SPS. Except for the general allegation that Clayton initiated the plan to regain control of SPS by fraudulent means, the complaint makes no particularized allegations of Clayton's actual involvement in the plan's execution. Nowhere in the complaint does Andrew allege that Clayton assisted in the preparation of the Wren letter or in its presentation to the SPS Board of Directors. The allegations of Mark's involvement are even thinner and are limited to the following statement:

> Defendants Clayton and Mark Smith were active participants in, or, in the alternative, were aiders and abetters with Defendant Ayers in the fraudulent conduct described above. The acts, failures to act, and knowledge of Defendant Ayres are imputed to Defendants Clayton Smith and Mark Smith.

The allegation that Clayton and Mark used their control of SPS for personal gain, standing alone, is not sufficient to constitute a claim that they *acquired* this control through securities fraud.

Nor is the complaint sufficient to allege that Clayton and Mark were indirect participants in a fraudulent scheme. A claim that defendant aided and abetted a violation of Rule 10b–5 requires the plaintiff allege, at the very least, that a securities violation occurred; that the defendant was generally aware of his or her participation in improper activity; and that the defendant rendered substantial and knowing assistance.[16] Even generously construed, Andrew's complaint alleged no facts supporting an inference of substantial or knowing assistance. Hence, the securities fraud claims against Clayton and Mark were properly dismissed.

### III

The district court found that Andrew failed adequately to plead the elements of a RICO claim because the complaint did not identify at least two predicate acts of criminal activity.[17] Although Andrew admitted before the district court that his complaint was inadequate in this regard, he contends that as stated in his complaint, the facts surrounding the Wren letter included at least two predicate acts, and that he should have been given the opportunity to amend his complaint to identify those acts specifically.[18]

By our reading of the complaint, Andrew alleged at most one predicate act,

---

**15.** *See Pin v. Texaco, Inc.,* 793 F.2d 1448, 1452 (5th Cir.1986); *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982). Rule 9(b) reads:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b).

**16.** *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95 (5th Cir.1975); *Decker,* 681 F.2d at 119; *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1983); *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 791 (3d Cir.1982).

**17.** *See* 18 U.S.C. § 1961(5) (stating that " 'pattern of racketeering activity' requires at least two acts of racketeering activity"); *Sedima S.P.R.L.*

*v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

**18.** As an alternative argument, Ayres contends that dismissal should be affirmed because the predicate acts alleged do not constitute a "pattern of racketeering activity." It is true that the acts underlying this RICO claim, like those alleged in *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423 (5th Cir.1987), were part of a "scheme to achieve a single discrete objective," i.e., to gain control of Smith Protective Services. Despite substantial authority to the contrary, however, a panel of this Circuit has held that two predicate acts are a pattern despite the absence of continuity or evidence that the wrongs were other than discrete episodic occurrences. *See R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985). As we noted in *Mon-*

the derivative securities-fraud claim.[19] The only other possible predicate act would have been a violation of the federal wire-fraud statute, which reads:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication *in interstate or foreign commerce,* any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.[20]

As several courts have recognized, the statute requires that the wire communication cross state lines.[21] Although this circuit never has faced an indictment or complaint alleging federal wire-fraud on the basis of telephone calls made within a single state, our rulings consistently have presumed that a purely intrastate communication would be beyond the statute's reach.[22] The two calls described in Andrew's complaint were made between telephones within the city of Dallas; Andrew alleges no interstate communication that occurred in connection with the issuance of securities

to Clayton. Hence, Andrew's complaint contained no reference to any act that could have constituted a violation of the wire-fraud statute. For this reason, we affirm dismissal of the RICO claim.

## IV

 In a separate opinion, the district court denied Andrew leave to amend his complaint. We review this denial, which is governed by Fed.R.Civ.P. 15(a), under an abuse of discretion standard.[23] "In the exercise of its discretion, the district court may consider such factors as prejudice to the opposing party, undue delay, repeated failure to cure deficiencies with prior amendment, bad faith, dilatory motive and futility of amendment." [24]

Andrew has already filed an original complaint and two amended complaints. Nevertheless, even in his latest proposed amendments he fails to remedy the most basic deficiencies in his earlier complaints. Under these circumstances, the trial court did not abuse its discretion in denying leave to amend.

AFFIRMED in part and REVERSED in part and REMANDED.

---

*tesano,* we are bound by *R.A.G.S.* pending reconsideration of the issue en banc or by the Supreme Court. *See Montesano,* 818 F.2d at 426; *Crocker v. FDIC,* 826 F.2d 347, 348 n. 2 (5th Cir.1987).

**19.** A Rule 10b–5 violation can constitute a predicate act under RICO. *See* 18 U.S.C. § 1961(1) ("racketeering activity" includes "fraud in the sale of securities").

**20.** 18 U.S.C. § 1343 (emphasis added). Although Andrew also contends that the defendants have violated the federal mail-fraud statute, 18 U.S.C. § 1341, he does not dispute the district court's conclusion that because the Wren letter was delivered to Ayres on the same day Ayres dictated it, it never was placed in the United States mail. Despite Andrew's assertion, the fact that the Wren letter included the notation, "cc: Mr. Ira Tobolowsky," does not make it any more likely that the letter was ever mailed.

**21.** *See Utz v. Correa,* 631 F.Supp. 592, 595–96 (S.D.N.Y.1986) (telephone calls made within one city cannot constitute predicate acts of wire-fraud in RICO complaint); *Harris Trust & Sav-*

*ings Bank v. Ellis,* 609 F.Supp. 1118, 1122 (N.D. Ill.1985) (same).

**22.** *See United States v. Gordon,* 780 F.2d 1165, 1171 (5th Cir.1986) (holding that indictment sufficiently alleged wire-fraud based on telephone conversation between Mississippi and Texas); *United States v. Cowart,* 595 F.2d 1023, 1031 n. 10 (5th Cir.1979) (noting that interstate communication element of wire-fraud offense was established by telephone call from Florida to Georgia); *United States v. Bradford,* 571 F.2d 1351, 1353 (5th Cir.1978) (affirming wire-fraud convictions premised on telephone calls from Tennessee to Georgia and Tennessee to Kentucky); *cf. United States v. Jackson,* 451 F.2d 281, 284 (5th Cir.1971) (upholding conviction based on interstate call even though defendant argued that the fraudulent objective could have been achieved through intrastate telephone call).

**23.** *See Union Planters Nat'l Leasing, Inc. v. Woods,* 687 F.2d 117, 121 (5th Cir.1982).

**24.** *Id.*