908 F.2d 967
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Lois HAMILTON, Individually and Personal Representative of
the Estate of Harry Hamilton, Deceased, Plaintiff-Appellee,
v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant-Appellant.
 No. 89-3336.
 United States Court of Appeals, Fourth Circuit.
 Argued April 2, 1990.
Decided July 13, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Walter E. Black, Jr., District Judge. (CA-88-1533-B)
 Peter Frederick Axelrad, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., (argued), for appellant; William L. Reynolds, Cynthia L. Leppert, Sophie D. Goetz, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief.
 Philip Helm Armstrong, Heeney, Armstrong & Heeney, Rockville, Md., for appellee.
 D.Md.
 REVERSED AND REMANDED.
 Before ERVIN, Chief Judge, K.K. HALL, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 As the beneficiary of her deceased husband's group life insurance policy, Lois Hamilton sought a declaratory judgment to determine whether Prudential Insurance Company was liable for business trip and employment-related accidental death benefits. The district court granted summary judgment for Mrs. Hamilton, finding that she was entitled to the benefits. Prudential appeals the summary judgment order and the court's denial of its motion for reconsideration under Federal Rule of Civil Procedure 59(e). We find that the district court, in considering the summary judgment motion, should have resolved disputed inferences in favor of the nonmoving party; consequently, we reverse and remand for a trial.
 
 
 2
 * Harry Hamilton, a Montgomery County police officer, was killed in an automobile accident between 5:00 and 6:00 a.m. on December 24, 1986, shortly after leaving his home in Carroll County, Maryland. The roads were icy that morning from freezing rain. It is unclear whether Mr. Hamilton was going directly to the police academy, his regular place of employment, or directly to the police headquarters to copy some materials for a class he was teaching at 9:30 a.m. that morning. The academy and headquarters are located about a mile apart in Montgomery County, Maryland.
 
 
 3
 At the time of his death, Mr. Hamilton had life and disability insurance through a group policy issued by Prudential to employees of Montgomery County. Two types of benefits provided in this policy are relevant to this dispute. First, the employee is entitled to benefits for accidental bodily injury suffered while on a business trip. "Business trip" is defined as follows:
 
 
 4
 An Employee will be considered to be on a Business Trip while he is on an assignment authorized by his Employer, at the expense of his Employer and primarily devoted to furthering his Employer's business interests, but not while he is engaging in any activity in connection with a vacation or leave of absence. An Employee will not be considered to be on a Business Trip if his assignment does not require him to travel beyond the corporate limits of Montgomery County, Maryland.
 
 
 5
 ... An Employee will not be considered on a Business Trip while he is traveling between his permanent residence and his regular place of employment.
 
 
 6
 Second, the employee is entitled to accidental death benefits for accidental bodily injury sustained "in the performance of his employment." Maryland courts have interpreted similar language in the worker's compensation context to exclude injuries sustained while an employee is traveling to or from work. Fairchild Space Co. v. Baroffio, 77 Md.App. 494, 551 A.2d 135 (1989). There is an exception to this rule if an employee was engaged in a "special errand":
 
 
 7
 [T]he journey may be brought within the course of employment by the fact that the trouble and time of making the journey, or the special inconvenience, hazard, or urgency of making it in the particular circumstances, is itself sufficiently substantial to be viewed as an integral part of the service itself.
 
 
 8
 Fairchild Space Co., 77 Md.App. at 501, 551 A.2d at 138 (quoting 1 Larson, Workmen's Compensation Law, Sec. 16.11 (1985)).
 
 
 9
 There is little evidence illuminating Hamilton's immediate destination. Lieutenant Crittenden, Mr. Hamilton's supervisor, signed an affidavit stating that Mr. Hamilton was not commuting to the academy at the time of his death, but "had been ordered by his immediate employer's supervisor to drive to the Montgomery County Police Headquarters prior to the beginning of his regular business day in order to perform special services for the benefit of his employer."
 
 
 10
 In a deposition, Crittenden explained that on the day before the accident, Hamilton had mentioned that he had to photocopy materials for his class. Crittenden suggested to Hamilton that he should do the copying job at the headquarters on his way to work the next morning, because the copy machine there was more efficient than the one at the academy. The following excerpts are taken from the deposition:
 
 
 11
 Q. Could he have gone over to headquarters that evening of the 23rd? Would headquarters have been open at 7:30?
 
 
 12
 A. It would have been, the headquarters where the copy room is open 24 hours a day, so it's conceivable he could have gone over there that evening. I have no way of knowing.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 Q. Would you describe that as an order to go there?
 
 
 16
 A. I would say that it was a direction. It's not my habit and never has been to order someone to say this is what you will do. My habit, particularly with experienced officers such as Officer Hamilton, is to suggest that they do something. And the people that work for me know that that's my idea of an order. If he hadn't done it the next morning--if I had walked in our copy machine and he was in there using up the copies, I would say why were you in there? I told you yesterday to go to headquarters.
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 Q. Do you know whether [Hamilton] did the copying of the materials on the 23rd?
 
 
 20
 A. He could have done them that evening. He indicated to me that he had to come in the next day to do it at the academy because it takes so long.
 
 
 21
 Q. But you don't know when he did it?
 
 
 22
 A. He could have done it any time between then and the next morning.
 
 
 23
 Q. Do you know if he copied the materials at all?
 
 
 24
 A. No, I don't know that.
 
 
 25
 Mrs. Hamilton, in an answer to an interrogatory, stated that her husband told her on the night before his death that
 
 
 26
 he had to go to Police Headquarters to take care of some work which he did not identify to me before he reported for duty at the Academy. He told me that he would be getting up earlier than normal in the morning and leaving early.
 
 II
 
 27
 Our review of whether the district court properly granted summary judgment is de novo. Farwell v. Un, 902 F.2d 282, 287 (4th Cir.1990). The general rule is that a court, in considering a summary judgment motion, must draw inferences from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir.1965).
 
 
 28
 The district court, in granting summary judgment for Mrs. Hamilton, drew some critical inferences. It inferred that Hamilton was traveling from his home directly to the headquarters. Another reasonable inference from the record is that Hamilton was traveling directly to the academy. He might have done the copying the night before the accident, and the hazardous road conditions may have prompted the early start on December 24. He might have intended to stop at the academy to follow his usual morning routine of changing into his uniform and drinking coffee, before going to headquarters.
 
 
 29
 The court also inferred that Hamilton was required to travel beyond the limits of Montgomery County. It is also reasonable to infer that Lieutenant Crittenden may only have suggested, but not required, that the photocopying be completed in the morning before Hamilton's arrival at the academy. It is possible that if Hamilton had completed the copying the night before, he would have complied with Crittenden's order. The particular time that the copying was to be done may not have been part of the requirement.
 
 
 30
 Additionally, the court inferred that Hamilton was on a special errand that required special inconvenience, hazard, or urgency. Even assuming he was going directly to the headquarters, another reasonable inference is that his trip did not require significantly more inconvenience, hazard, or urgency than his usual commute. The headquarters is only about a mile from the academy. Hamilton was required to report to work at 7:15 a.m.; he normally arrived at the academy at 6:45 a.m. It is reasonable to conclude that even if Hamilton had left home at his usual time, he could have completed the copying task in time for his 9:30 class.
 
 
 31
 The district court relied on Nunez v. Superior Oil Co., 572 F.2d 1119 (5th Cir.1978), for the proposition that in a nonjury case where there are no genuine issues of material fact and no issues of witness credibility, the court can draw inferences in favor of the party moving for summary judgment. The court in Nunez suggested in dicta that in the rare circumstance when a trial "would not enhance [the court's] ability to draw inferences and conclusions," it would serve judicial efficiency in a nonjury case for the court to decide the case on the merits at the summary judgment stage. 572 F.2d at 1124. This principle has been the basis of holdings in cases subsequent to Nunez. See, e.g., Houston North Hosp. Properties v. Telco Leasing, Inc., 680 F.2d 19, 22 (5th Cir.1982); Alabama Farm Bureau Mut. Casualty Co. v. American Fidelity Life Ins. Co., 606 F.2d 602, 609-10 (5th Cir.1979).
 
 
 32
 It is unnecessary to decide if this circuit would draw the distinction between nonjury and jury cases suggested by Nunez. Even if we adopted the Nunez principle, it would not apply here because the credibility of the two critical witnesses is at issue. See Alabama Farm Bureau Mut. Casualty Co., 606 F.2d at 609-10. There are differences between Crittenden's affidavit and his deposition testimony. In the affidavit, he states that Hamilton was en route to the headquarters when the accident occurred. In his deposition, he admitted that Hamilton could have done the copying the night before at the headquarters. In the affidavit, he states that he ordered Hamilton to drive to the headquarters on his way to work on December 24. In his deposition, he admitted that it was a direction, not an order.
 
 
 33
 Mrs. Hamilton's interrogatory answer also raises a credibility issue, even though Prudential offers no contradictory evidence. She is the moving party and the only person with knowledge of Hamilton's statement about his destination. Cross-examination of Mrs. Hamilton and Crittenden would be helpful in making factual conclusions about the requirements of the copying assignment, Hamilton's immediate destination, and the special inconvenience, hazard, or urgency of the trip. We hold that the court should not have resolved an issue of credibility without the benefit of live testimony. See Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962); 6 J. Moore & J. Wicker, Moore's Federal Practice, p 56.15, at 56-293 (1988).
 
 
 34
 Our reasons for setting aside the summary judgment should not be read as an expression of opinion about the outcome of the case. On remand, after thoroughly canvassing the evidence with the benefit of hearing live testimony and cross examination to resolve credibility issues, the district court will be in a position to draw inferences unencumbered by the principles that limit grants of summary judgment. We reverse the order granting summary judgment for Mrs. Hamilton and remand for a trial.